**UNITED STATES of America, Appellee,**

v.

**Vincent CAPUTO, and Vincent Potenza, Defendants-Appellants.**

**No. 307, Docket 86–1281.**

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1986.

Decided Jan. 6, 1987.

David E. Brodsky, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Kenneth Roth, Asst. U.S. Atty., New York City, of counsel), for appellee.

Nicholas R. Canizio, Ozone Park, N.Y. (Oddo & Canizio, of counsel), for defendants-appellants.

Before MESKILL, MINER and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Vincent Caputo and Vincent Potenza appeal from judgments of conviction entered in the United States District Court for the Southern District of New York after a

four-day jury trial before Judge Richard Owen. Appellants were charged in a two-count indictment with violations of a recently enacted federal statute which prohibits various types of credit card fraud, 18 U.S.C. § 1029. Count One charged appellants with conspiracy to possess fifteen or more unauthorized access devices with intent to defraud, in violation of 18 U.S.C. § 1029(b)(2). Count Two charged appellants with possession of fifteen or more unauthorized access devices with intent to defraud, in violation of § 1029(a)(3). The "unauthorized access devices" at issue were approximately 60 credit card account numbers printed on the backs of restaurant checks from Angelo's Restaurant in New York City. Appellant Caputo was sentenced to five years' imprisonment on Count Two, to be followed by five years' probation on Count One. Appellant Potenza was sentenced to seven and one-half years' imprisonment on Count Two, to be followed by five years' probation on Count One. We affirm both convictions.

The government's key evidence was offered by Special Agent Richard Ensminger of the United States Secret Service. Ensminger testified that on April 13, 1985 he and Special Agent Joseph Oliver were conducting a credit card investigation in the Little Italy section of Manhattan. The agents were eating lunch in a restaurant called Tony's on Mulberry Street. While inside Tony's they observed appellant Caputo's car pull up in front of the restaurant. Caputo entered Tony's and made a call from the public telephone. Within 15 minutes appellant Potenza entered Tony's, spoke with Caputo for a few minutes and then left. Potenza returned shortly, carrying a white plastic bag which he handed to Caputo. Caputo did not look inside the bag. He left the restaurant, walked directly across the street and placed the bag inside a garbage can located on the sidewalk. Caputo then returned to Tony's, where he and Potenza spoke briefly. The two men went outside and continued talking; after a few minutes, they left the area.

Agent Ensminger, suspecting that the plastic bag might contain contraband, called Secret Service offices to arrange for another agent to retrieve the bag. Special Agent Marc Sidbury responded to the call and recovered the white plastic bag from the garbage can. The bag contained 85 restaurant checks from Angelo's Restaurant, the majority of which were attached to carbon imprints of either Visa or Mastercard credit cards. Appellant Potenza's fingerprints were found on three of the checks. Appellants were neither employees of Angelo's Restaurant, nor authorized by anyone at Angelo's to possess the checks for any purpose.

An expert witness for the government, Justin Tobia, testified that credit card account numbers are essential to the success of any fraudulent credit card scheme. During the five months following the government's seizure of the white plastic bag, 17 of the account numbers appearing on the checks were used in fraudulent transactions.

Appellants denied that they had possessed the account numbers with an intent to defraud. To prove that appellants had the requisite intent, the government offered evidence of previous credit card schemes in which appellants were involved.

One scheme involved both appellants and a third individual named Joseph Melita. The government offered recorded phone conversations between Melita and Caputo, obtained pursuant to a court-ordered wiretap, and evidence of meetings among the three men, at which credit cards were allegedly exchanged.

A New York City police sergeant then testified that while on a credit card investigation in 1983, he observed appellant Caputo buying a case of videotapes with a counterfeit credit card. At the time of this purchase, Caputo was also carrying four other counterfeit cards.

Defense counsel for appellant Caputo offered a portion of a tape-recorded phone conversation from March 1985 during which Caputo was warned by an unidentified man that he was being followed. Ca-

puto's lawyer then argued that his client would not have engaged in the conduct charged in April 1985 because he knew he was under surveillance. Appellants were found guilty on both counts of the indictment.

## I.

Appellants first contend that the statute under which they were convicted, 18 U.S.C. § 1029, does not criminalize possession or conspiracy to possess restaurant checks with credit card account numbers imprinted on them. Section 1029(a)(3) authorizes punishment for a person who "knowingly and with intent to defraud possesses fifteen or more devices which are counterfeit or unauthorized access devices." Section 1029(b)(2) authorizes punishment for persons who conspire to commit any of the offenses detailed in subsection (a).

An "access device" is defined as

any card, plate, code, *account number,* or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).

18 U.S.C. § 1029(e)(1) (emphasis added). An "unauthorized" access device means "any access device that is lost, stolen, expired, revoked, canceled, or *obtained with intent to defraud." Id.* § 1029(e)(3) (emphasis added).

It is apparent from the statutory language itself that account numbers fall within the definition of access devices. There is no requirement that the number be printed on any particular medium. Account numbers are clearly a means of account access, within the terms of § 1029(e)(1), which can be used alone or in conjunction with another access device such as a counterfeit card, to obtain something of value.

Moreover, the legislative history of the statute reflects a clear intent to address the problem of misused account numbers.

For example, the Senate observed that "the most stunning increases [in credit card fraud] have occurred in relatively new areas of criminal activity: counterfeiting and alteration of cards, and misuse of account numbers." S.Rep. No. 368, 98th Cong., 2d Sess. 2, *reprinted in* 1984 U.S. Code Cong. & Ad. News 3647, 3648.

Appellants also claim that their conduct falls within the exception at the end of § 1029(e)(1). This exception excludes from the definition of "access device" a device which is used to initiate a transfer of funds originated solely by paper instrument. Appellants' argument seems to be that the statutory exception applies because the account numbers in this case were printed on *paper* restaurant checks. As the legislative history explains, however, this exception in fact applies to passing bad or forged checks. *See* S.Rep. No. 368 at 10, 1984 U.S. Code Cong. & Ad. News at 3656; H.R. Rep. No. 894, 98th Cong., 2d Sess. 19, *reprinted in* 1984 U.S. Code Cong. & Ad. News 3689, 3705. Appellants were charged with possessing account numbers with the intent to defraud. Such conduct is unquestionably covered by the statute under which they were convicted.

## II.

Appellants also claim they were denied effective assistance of counsel because their trial attorneys did not move to suppress the restaurant checks on the ground that no search warrant for the trash can had been obtained. Appellants assert that such a suppression motion would have been granted, thereby depriving the government of its strongest evidence.

In order to have their convictions reversed on the basis of ineffective assistance, appellants must demonstrate both that counsel's performance was unreasonable and that counsel's incompetence caused them actual prejudice. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *See also Kimmelman v. Morrison,* —— U.S. ——, 106 S.Ct. 2574, 2583, 91 L.Ed.2d 305 (1986);

*Darden v. Wainwright,* —— U.S. ——, 106 S.Ct. 2464, 2473–74, 91 L.Ed.2d 144 (1986). As this court recently explained,

[T]he defendant must overcome a presumption that his counsel's conduct was reasonable and meet the two-prong standard of, first, showing that it fell below "an objective standard of reasonableness" under "prevailing professional norms," and, second, "affirmatively prov[ing] prejudice," that is, demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*United States v. Cruz,* 785 F.2d 399, 405 (2d Cir.1986) (citations omitted) (quoting *Strickland,* 466 U.S. at 688, 693–94, 104 S.Ct. at 2065, 2067–68).

■ We need not reach the second prong of the *Strickland* standard in this case, for it is evident that trial counsel's failure to make the suppression motion was entirely reasonable. Trial counsel probably realized that the motion would not have been granted because there is no legal basis to support suppression of the restaurant checks.

■ The guiding principle in fourth amendment analysis is whether the person claiming the violation had a "constitutionally protected reasonable expectation of privacy." *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Constitutional protection attaches when an individual has a subjective expectation of privacy which society recognizes as reasonable. *See California v. Ciraolo,* —— U.S. ——, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986); *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). Where there is no reasonable expectation of privacy, no search warrant is required.

Despite any subjective expectations which appellants may have had, they have not cited any support for the proposition that an expectation of privacy in someone else's trash can on a public street is objectively reasonable. Indeed, an individual ordinarily retains no expectation of privacy in his own garbage when it has been deposited in the street for collection. *United States v. Terry,* 702 F.2d 299, 309 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 and 464 U.S. 992, 104 S.Ct. 482, 78 L.Ed.2d 680 (1983). *See also Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960); *United States v. Dzialak,* 441 F.2d 212, 215 (2d Cir.), *cert. denied,* 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165 (1971). According to *Terry,* 702 F.2d 299, factors which could suggest an intent to retain a privacy interest in one's own trash include "written restrictions on containers or retention of containers on private property until collected." *Id.* at 309. In the absence of such circumstances, no privacy interest will be recognized.

In the present case, there were no special circumstances to support the expectation of privacy which appellants now claim. Appellants disposed of an unmarked plastic bag in a receptacle which was neither their can nor on their property. To all outward appearances, they had thrown the bag away. Regardless of appellants' subjective intentions, their claim of privacy in some third party's trash can on a public street is not the type of expectation which our society recognizes as reasonable. *See Smith,* 442 U.S. at 740, 99 S.Ct. at 2580.

Appellants' trial counsel, therefore, exercised sound professional discretion by declining to make a plainly frivolous suppression motion; accordingly, appellants' ineffective assistance claim must fail.

### III.

Appellants next argue that evidence of prior similar acts which pointed to their involvement in previous credit card schemes was improperly admitted. This evidence was admitted pursuant to Fed.R. Evid. 404(b) which provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other pur-

poses, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In order to be admissible under Rule 404(b), the probative value of the similar act evidence must not be substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403. *See, e.g., United States v. Figueroa,* 618 F.2d 934, 939 (2d Cir. 1980); *United States v. Mohel,* 604 F.2d 748, 751 (2d Cir.1979). The district court is vested with broad discretion to admit similar act evidence under Rule 404(b), and its decision will not be reversed on appeal except for abuse of that discretion. *See, e.g., United States v. Reed,* 790 F.2d 208, 211–12 (2d Cir.1986); *United States v. Martino,* 759 F.2d 998, 1005 (2d Cir.1985).

■ Where intent to commit the crime charged is clearly at issue, evidence of prior similar acts may be introduced to prove that intent. *E.g., United States v. Smith,* 727 F.2d 214, 220 (2d Cir.1984); *United States v. DeFillipo,* 590 F.2d 1228, 1240 (2d Cir.), *cert. denied,* 442 U.S. 920, 99 S.Ct. 2844, 61 L.Ed.2d 288 (1979). The government may introduce such evidence during its case-in-chief, rather than waiting until the conclusion of the defendant's case, as long as it is apparent that intent will be in dispute. *See United States v. Reed,* 639 F.2d 896, 906–07 (2d Cir.1981).

■ In the present case, the government was required to prove that appellants possessed the account numbers with intent to defraud. 18 U.S.C. § 1029(a)(3). The element of intent was thus clearly at issue, and evidence of appellants' involvement with previous credit card schemes was therefore probative of their intent in possessing the "access devices" for which they were charged.

Judge Owen conferred with counsel during trial regarding the propriety of admitting the similar act evidence. Contrary to appellants' assertion, the prior act evidence was not introduced to prove appellants' criminal propensity. Indeed, Judge Owen instructed the jury properly on three separate occasions about the limited purpose for which the evidence was admitted. In light of these considerations, we cannot say that the district court abused its discretion in admitting the similar-act evidence under Rule 404(b).

### IV.

■ Finally, appellants contend that certain comments by the prosecution during rebuttal summation constituted reversible error because they impugned defense counsel's integrity. They object specifically to the following opening remarks:

> First of all, I will not be making any jokes or otherwise making light of this proceeding, because these are serious matters. I will not detract from the seriousness of the proceeding by making references to movies or by intentionally mispronouncing any witnesses' names; and most importantly, I will not try to confuse or mislead you by playing fast and loose with the record in this case.

They object also to an assertion which characterized part of defense counsel's argument as "just one example of the numerous misrepresentations and sheer inventions that [defense counsel] put into his summation."

Rather than constituting an unwarranted attack on defense counsel, however, the government's argument was an appropriate response to defense counsel's summation. Appellant Caputo's defense counsel made several statements during summation which led Judge Owen to reprimand him at side bar: for example, likening the government's investigatory tactics to "Hitler's Germany," and warning the jurors that their deliberations would be divisive and traumatic. Judge Owen also noted that defense counsel had misrepresented the record and alluded to facts outside the record during their summations.

The prosecutor's rebuttal comments were directly responsive to the defense summation, and were motivated by a "permissible desire to dispute defense histrionics." *United States v. Marrale,* 695 F.2d 658, 667 (2d Cir.1982), *cert. denied,* 460

U.S. 1041, 103 S.Ct. 1434, 1435, 75 L.Ed.2d 793 (1983).

This court has previously upheld the use of vigorous rebuttal by the prosecution. *E.g., id.* at 667 (prosecutor warned the jury not to be fooled by defense attorney's tactics); *United States v. Perry,* 643 F.2d 38, 51 (2d Cir.) (prosecutor described defense attorney's attack as a "desperate," "struggling" tactic), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981). The government may rely on rhetorical devices to respond to "prosecutor-baiting" by the defense. *United States v. Bagaric,* 706 F.2d 42, 60–61 (2d Cir.), *cert. denied,* 464 U.S. 840, 917, 104 S.Ct. 134, 283, 78 L.Ed.2d 128, 261 (1983). There was simply nothing said in rebuttal summation in the present case which was egregious enough to have deprived appellants of a fair trial.

For all the foregoing reasons, the convictions are affirmed.