**UNITED STATES of America, Appellee,**

v.

**Joseph PITRE; Edwyn Pitre; Angel M. Otero; Richard Pitre, Defendants–Appellants.**

**Nos. 004, 005, 003 and 006, Dockets 90–1558, 90–1559, 90–1573 and 90–1574.**

United States Court of Appeals, Second Circuit.

Argued Sept. 16, 1991.

Decided March 30, 1992.

Barry M. Fallick, New York City (Bobbi C. Sternheim, Rochman Platzer Fallick & Rosmarin, New York City, of counsel), for defendant-appellant Joseph Pitre.

Kenneth W. Salaway, New York City, (Salaway & Schreiber, New York City, of counsel), for defendant-appellant Edwyn Pitre.

Russell M. Leisner, Forest Hills, N.Y., for defendant-appellant Angel M. Otero.

Roger B. Adler, New York City, for defendant-appellant Richard Pitre.

Elizabeth Glazer, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Gerard E. Lynch, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before MESKILL, PIERCE and MAHONEY, Circuit Judges.

PIERCE, Circuit Judge:

Richard Pitre, Edwyn Pitre, Joseph Pitre, and Angel M. Otero appeal from judgments

entered in the United States District Court for the Southern District of New York, Nicholas Tsoucalas, *Judge*,[1] after a six-day jury trial commencing June 12, 1990, in which each was found guilty of one count of conspiracy to distribute and possess with intent to distribute approximately 4.9 kilograms of heroin in violation of 21 U.S.C. § 846. Richard Pitre was sentenced to 293 months' imprisonment; Edwyn Pitre was sentenced to 144 months' imprisonment; and Joseph Pitre and Otero were each sentenced to 120 months' imprisonment. In addition, each appellant was sentenced to 5 years' supervised release and was assessed $50. The appellants are currently serving their sentences. Numerous issues are presented for review, including challenges to the district court's admission of certain prior act evidence, and sufficiency of the evidence claims. Further, various fifth amendment and sentencing issues are raised. Some of these issues apply to multiple appellants, others apply only to individual appellants. For the reasons set forth below, we affirm as to each appellant.

## BACKGROUND

On August 3, 1989, the government filed a three-count indictment against each of the appellants and three other individuals, Wai Yip Lin, a/k/a "Sonny", Anan Peter Peechaphand, and Mark Larotonda. Count One, the only count in which the four appellants were named, charged all seven defendants with conspiring to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. § 846.[2] The indictment alleged that on July 13, 1989, near South and John Streets in Manhattan, Lin and Peechaphand met with an undercover agent of the Drug Enforcement Administration ("DEA") and discussed a proposed

heroin transaction. According to the indictment, that same day, defendants Lin, Peechaphand, Richard Pitre, Edwyn Pitre, Joseph Pitre, Otero, and Larotonda drove to the area of Orchard and Division Streets in Manhattan, where Richard Pitre displayed approximately $630,000 in cash to a DEA agent in the presence of each defendant except Larotonda.

At trial, Robert Hom, a detective with the New York City Police Department, assigned to the DEA's Southeast Asian Heroin Task Force, testified that he became involved in an investigation of Peechaphand in June of 1989. Hom testified that while posing as an undercover narcotics dealer, he was introduced to Peechaphand by Lin after Hom told Lin that he was interested in purchasing cocaine. According to Hom, on June 20, 1989, he purchased cocaine from Peechaphand for $10,000. Hom testified that, on July 11, 1989, "Lin told me that he was looking to buy some heroin, and [asked whether] I had any." Hom responded that he had ten "pieces" available. He explained, while testifying, that Asian heroin is packaged in "units" or "pieces" and that a unit is "a pound and a half of heroin, which is equal to 700 grams." Lin told Hom that he could take the heroin because he had some "buyers in Brooklyn." Hom and Lin discussed how the transaction would proceed: Lin was to bring the buyers with the money; Hom was to bring the heroin; the buyers would look at the heroin and Hom would look at the money.

Peechaphand, testifying for the government, stated that a few days before July 13, 1989, he contacted Richard Pitre by beeper and met with him in Brooklyn to ask him if he was interested in purchasing

---

1. Judge of the United States Court of International Trade, sitting by designation.

2. Counts Two and Three, which also alleged narcotics violations, named only Lin and Peechaphand. Lin pleaded guilty to Count One of the indictment. Under an agreement with the government, Lin was sentenced after testifying for the government in the prosecution of the appellants. He was sentenced to 5 years' supervised release and was assessed $50. Peechaphand pleaded guilty to Count One of the indict- ment pursuant to a cooperation agreement with the government. He was sentenced to 60 months' imprisonment, 5 years' supervised release and was assessed $50. The government's motions to dismiss Counts Two and Three against Lin and Peechaphand were granted. Larotonda pleaded guilty to Count One of the indictment and was sentenced to 120 months' imprisonment, 5 years' supervised release and was assessed $50.

the heroin. According to Peechaphand, Richard Pitre expressed interest. Peechaphand then contacted Lin who indicated he would contact Hom. Hom testified that Lin contacted him, using a beeper, and that in a subsequent telephone conversation, Lin stated that the "[buyers] in Brooklyn" wanted Lin to see the "merchandise before they got their money together." On July 13, 1989, at approximately 2:15 p.m., Lin and Peechaphand met Hom near South and John Streets in Manhattan. Upon the arrival of Lin and Peechaphand, Hom signaled Special Agent Tim Lum to drive a car, containing a zippered bag with what was purportedly twelve units of heroin, to South Street. When Lum drove up and parked on South Street, Hom displayed the contents of the bag to Peechaphand. Lin told Hom that he would contact Hom "later on."

Later that day, Peechaphand contacted Richard Pitre by beeper and Richard Pitre and he met to discuss the transaction. Peechaphand stated that he informed Richard Pitre that he had seen the heroin and that the price was $90,000 per unit. According to Peechaphand, Richard Pitre agreed to the price and told him that he would contact him after determining how much money he had available. Peechaphand testified that Richard Pitre returned approximately ten minutes later, informed him that he could only afford seven units, and asked him for the three remaining units on credit. Peechaphand refused this request. Peechaphand then contacted Lin who, after conferring with Hom, informed Peechaphand that Hom would be willing to sell seven units. Peechaphand testified that Richard Pitre stated that he would be ready sometime later that night.

Sometime after 5:30 p.m., on July 13, 1989, discussion ensued between Peechaphand and Hom as to where the transaction should take place. Peechaphand stated to Hom that "my people, we only like to do it in Queens," and "[w]e [are] not familiar with doing a transaction in Manhattan." However, Peechaphand and Hom eventually determined that the transaction would take place near the area of Allen and Delancey Streets in Manhattan. Peechaphand testified that he called Richard Pitre and after some discussion, Richard Pitre agreed to conclude the transaction in Manhattan. Peechaphand and Larotonda drove into Manhattan to the vicinity of Orchard and Division Streets where Peechaphand informed Larotonda the transaction would take place. Peechaphand and Larotonda then returned to Brooklyn. In addition, Peechaphand testified that he had told Lin that Hom agreed to meet at Allen and Delancey Streets. Lin was also informed, by Peechaphand, that Larotonda, Richard Pitre, and Peechaphand were going to be at Orchard and Division Streets.

Hom testified that, at approximately 9:30 p.m., he proceeded to Delancey and Allen Streets where he met Lin. Lin informed him that Peechaphand was "in Brooklyn getting the money with the ... guys." According to Hom, Lin instructed Hom to follow him approximately eight blocks to Orchard and Division Streets, an area Hom described as "deserted." At approximately 9:40 p.m., Richard Pitre, driving a black and gray Nissan Pathfinder, followed by other cars, met Peechaphand and Larotonda in Brooklyn. Peechaphand testified that when he asked Richard Pitre why there were so many cars and people, Richard Pitre responded: "No problem." Thereafter, Peechaphand and Larotonda, travelling in a white Nissan Maxima, headed toward Manhattan followed by the Pathfinder and the other cars.

Hom testified that, while standing with Lin on Division and Orchard Streets, he noticed Peechaphand's car drive past him. According to Peechaphand, Larotonda parked the Maxima on one side of Division Street while the cars following it parked on the other side of the street. While Larotonda went to talk with Lin, Peechaphand crossed the street to talk with Edwyn Pitre, Richard Pitre, and one Jose Rodriguez. According to Peechaphand, Edwyn Pitre told Peechaphand that there was "somebody in a parked car." Peechaphand then approached Lin and Hom on Division and Orchard Streets, and stated that there were "some people" in a Mercedes parked on Division Street. According to Peechap-

hand, Hom stepped in and stated that they were his friends. Peechaphand testified that when he informed Edwyn Pitre that the parked car was not a problem, Edwyn Pitre responded: "Fine. You got to be careful."

Peechaphand, accompanied by Lin, then introduced Hom to Richard Pitre. Lin, testifying for the government, stated that when he asked Richard Pitre why there were so many people, Richard Pitre responded: "[T]hey are here to carry the money." Hom testified that Richard Pitre led him to the rear of the Pathfinder where Edwyn Pitre and Rodriguez were standing. According to Hom, one of these two men told Richard Pitre that the money was in the other car. Richard Pitre then led Hom to a Ford Mustang, which was parked in front of the Pathfinder. Hom testified that Joseph Pitre was seated in the driver's seat of the Mustang. Richard Pitre opened the door of the Mustang, reached into the back seat, unzipped a bag, and showed Hom that it contained money. Hom testified that he entered that car, looked at the individual sitting in it, looked at the money, and put his hand in the bag to see if it was filled with money. According to Hom, Richard Pitre said: "That's this, and there's another bag." Richard Pitre then led Hom to a Suzuki Samurai, which was parked in front of the Mustang, opened up a bag of money on the front seat, and stated: "That's the rest of the money." Hom testified that Otero was seated in the driver's seat of the Samurai.

After viewing the money in the Samurai, Hom told Lin he was going to "call the guys in with the stuff." Hom, using a mobile phone, notified his supervisor, whereupon Lin, Peechaphand, Richard Pitre, Edwyn Pitre, Joseph Pitre, Otero, and Rodriguez were arrested.[3] At trial, the government introduced stipulations that it had recovered $292,820 from the Mustang and $330,985 from the Samurai. In addition, the government introduced beepers that had been seized from Richard Pitre, Edwyn Pitre, Joseph Pitre, and Otero. Also introduced was a business card with

Joseph Pitre's name and a number with the word "beeper" at the end of it, which had been seized from Otero.

## DISCUSSION

### I. *Prior Act Evidence*

At the beginning of the appellants' trial, the government informed the district court that it intended to introduce evidence of prior narcotics transactions involving Lin, Peechaphand, Richard Pitre, and Edwyn Pitre. The district court stated it would allow the introduction of such evidence for two purposes: to show the development of the conspiracy; and to show that Richard Pitre and Edwyn Pitre were "not there just to be standing there" on the night of their arrests. The attorneys for both Richard Pitre and Edwyn Pitre objected to the introduction of such evidence.

To establish the existence of prior narcotics dealings involving Richard Pitre and Edwyn Pitre, the government, in its case-in-chief, presented testimony from Lin and Peechaphand. According to Peechaphand, his first discussion concerning a possible narcotics deal with Richard Pitre occurred in May of 1988. Pursuant to this discussion, Peechaphand arranged and attended a meeting between Richard Pitre and Peter Koo, a friend of Peechaphand, in which Richard Pitre and Koo talked about a possible cocaine deal. According to Peechaphand, approximately three weeks later, Richard Pitre met with him to inquire about a proposed heroin purchase with Koo. Peechaphand then contacted Lin who informed Peechaphand that he could procure heroin for Richard Pitre from his source but would need the money in advance. Peechaphand testified that, pursuant to Richard Pitre's agreement, he met Pitre in Brooklyn, picked up Pitre's money, and delivered it to Lin in Manhattan. Lin, in turn, procured the heroin, and delivered it to Peechaphand who, joined by Lin, returned to Brooklyn to deliver the heroin to Richard Pitre. Peechaphand testified that, approximately a month after this initial transaction, pursuant to an inquiry by

---

**3.** Rodriguez was not named in the indictment. Larotonda was arrested later on July 17, 1989.

Richard Pitre, another heroin deal was completed.

According to Peechaphand, a one-unit transaction was attempted in late September of 1988, but was unsuccessful when Lin's source could not supply the heroin. Despite this failure, a transaction was attempted in October of 1988, at Peechaphand's initiation. In accordance with the terms of this transaction, Richard Pitre was to supply Peechaphand with $160,000 and Peechaphand was to procure two units of heroin. However, this transaction failed when the source absconded with Richard Pitre's money. Acknowledging his debt, Peechaphand stated that he was able to repay Richard Pitre partly in cash, and partly through a transaction he arranged in which Richard Pitre would receive two and one-half units of heroin for the price of two units. However, according to Peechaphand, Richard Pitre was displeased with the quality of the extra half unit and returned it to Peechaphand. Peechaphand testified that he was eventually able to repay Richard Pitre through a transaction in December of 1988 or January of 1989 in which Richard Pitre received five units of heroin for the price of four. At the end of Peechaphand's direct testimony, the district court instructed the jury, *inter alia*, that Peechaphand's testimony regarding transactions prior to July 13, 1989, was admissible only as against Richard Pitre; later, the jury was instructed further as to its limited use.

In substance, Lin's testimony concerning prior narcotics transactions with Peechaphand and Richard Pitre corroborated Peechaphand's testimony about such events. In addition, Lin testified that the first heroin transaction he was involved in with Richard Pitre occurred in August of 1988. During that transaction, Lin observed a man on a red and white Suzuki motorcycle, when he and Peechaphand delivered the heroin to Richard Pitre. Lin testified that he learned that this man was Richard Pitre's brother. In court, Lin identified Edwyn Pitre as the person who was on the motorcycle. According to Lin, Edwyn Pitre and another individual on a second motorcycle drove around the designated delivery area, parked, and looked in various directions. Lin then testified that he observed Richard Pitre on the corner across from the motorcyclists, and that the deal was consummated between Peechaphand, Richard Pitre, and him. Lin also testified that he observed the red and white Suzuki nearby when Peechaphand and he delivered heroin to Richard Pitre pursuant to yet another transaction. At the end of Lin's testimony, the district court instructed the jury that the testimony of Lin regarding transactions prior to July 13, 1989, did not concern either Joseph Pitre or Otero. The district court also instructed the jury that the testimony concerning previous transactions was admissible only to show a relationship of trust between the parties and that "they knew about transactions of this type ... if you find that they were involved." Later, the district judge, in his charge to the jury, stated that the evidence of prior narcotics transactions could only be considered for the limited purposes of showing the background of the conspiracy and the relationship between Lin, Peechaphand, Edwyn Pitre, and Richard Pitre, and as to whether Richard Pitre and Edwyn Pitre acted knowingly and intentionally herein and not for some innocent reason.

On appeal, Richard Pitre argues that the district court erred in allowing the government to present evidence of prior drug transactions during its case-in-chief. Richard Pitre also contends that such evidence was not relevant and that, even if relevant, its probative value was outweighed by the danger of unfair prejudice. Edwyn Pitre adopts these arguments.

### Fed.R.Evid. 404(b)—General Principles

■ Fed.R.Evid. 404(b) provides that prior act evidence "is not admissible to prove the character of a person in order to show action in conformity therewith", but "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." "Under the 'inclusionary' approach to the rule followed by this circuit, such evidence 'is admissible for any purpose other than to show a defendant's criminal propensity.'"

*United States v. Roldan–Zapata,* 916 F.2d 795, 804 (2d Cir.1990) (citation omitted), *cert. denied,* —— U.S. ——, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991). However, under Fed.R.Evid. 403, such evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

■ The standards by which a district court is to assess the admissibility of other acts evidence under Rule 404(b) are well-established. *See United States v. Colon,* 880 F.2d 650 (2d Cir.1989). First, the district court must determine if the evidence is offered for a proper purpose, one other than to prove the defendant's bad character or criminal propensity. If the evidence is offered for a proper purpose, the district court must next determine if the evidence is relevant to an issue in the case, and, if relevant, whether its probative value is substantially outweighed by the danger of unfair prejudice. Finally, upon request, the district court must give an appropriate limiting instruction to the jury. Since a district court is in the best position to evaluate the evidence and its effect on the jury, its rulings on admissibility under Rule 404(b) will not be overturned on appeal absent a clear showing of abuse of discretion. *United States v. Smith,* 727 F.2d 214, 220 (2d Cir.1984). To find abuse, the appellate court must conclude that the district court acted arbitrarily and irrationally.

Relevance—Background of the Conspiracy

■ Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed. *Roldan–Zapata,* 916 F.2d at 804. In *Roldan–Zapata,* this court affirmed the district court's decision to admit evidence of a pre-existing drug-trafficking relationship between the defendant and a co-conspirator to aid the jury's understanding of how the transaction for which the defendant was charged came about and his role in it. In the present case, the district court did not commit error in determining that the evi-

dence of prior narcotics transactions was relevant in informing the jury of the background of the conspiracy charged, in that such evidence could help explain to the jury the relationship between Richard Pitre, Edwyn Pitre, Lin, and Peechaphand.

Relevance—Intent or Knowledge

■ Where a defendant's intent or knowledge is clearly at issue, evidence of prior acts may be admissible to prove intent or knowledge. *See United States v. Caputo,* 808 F.2d 963, 968 (2d Cir.1987). Herein, the government was required to prove that Richard Pitre and Edwyn Pitre knowingly or intentionally conspired to distribute heroin, or to possess it with intent to distribute it. *See* 21 U.S.C. §§ 812, 841(a)(1), and 846. Thus, the intent or knowledge of Richard Pitre and Edwyn Pitre were clearly at issue, and evidence of their involvement in prior narcotics transactions was probative of their intent or knowledge in connection with the crime charged. *See Caputo,* 808 F.2d at 968.

We acknowledge that " 'a defendant may completely forestall the admission of ... other act evidence on the issue of intent by 'express[ing] a decision not to dispute that issue....' '" *See Colon,* 880 F.2d at 657 (citations omitted). However, to take intent out of a case, "a defendant must make some statement to the court of sufficient clarity to indicate that the issue will not be disputed." *Id.* at 659. It is clear from the opening statements by the attorneys for both Richard Pitre and Edwyn Pitre that they did not remove the issue of Richard Pitre's or Edwyn Pitre's intent or knowledge from the case. For example, Richard Pitre's attorney stated that there was no dispute over whether Richard Pitre was present at the arrest scene but, an issue did exist as to whether Richard Pitre "knew and agreed, conspired to possess with intent to distribute, heroin." His attorney went on to state: "That is what is in dispute and that is an essential element of the crime charged." Likewise, Edwyn Pitre's attorney stated: "The fact that [Edwyn Pitre] was there does not show he intentionally knew." Based on these statements

on behalf of Richard Pitre and Edwyn Pitre, we conclude that neither defendant removed the issue of his respective intent or knowledge from the case as a trial issue.

■ Addressing the contention that the district court erred in admitting evidence of prior narcotics transactions during the government's case-in-chief, we note that, as a general rule, the offer of evidence to prove the defendant's intent or knowledge should await the conclusion of the defendant's case. *See Colon,* 880 F.2d at 660. However, where it is apparent that intent will be in dispute, evidence of prior or similar acts may be introduced during the government's case-in-chief, "rather than waiting until the conclusion of the defendant's case." *Caputo,* 808 F.2d at 968. Since the intent or knowledge of Richard Pitre and Edwyn Pitre were issues in dispute at trial, as evidenced by the opening statements made on behalf of each of them, the district court did not err in admitting evidence of prior narcotics transactions during the government's case-in-chief.

Probative Value and Danger of Unfair Prejudice

■ Richard Pitre argues that the district court did not engage in an explicit Rule 403 balancing analysis. However, where the issues of both the probative value and possible prejudicial effect of admitting prior act evidence are presented to the district court when it makes its decision to admit such evidence, a mechanical recitation of the Rule 403 analysis is not required. *United States v. Sliker,* 751 F.2d 477, 487 (2d Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). Prior to opening statements, the court was made aware of the possible prejudicial effect of the evidence of prior narcotics transactions through objections by the attorneys for Richard Pitre and Edwyn Pitre. Following these objections, the district judge determined that the evidence would be admissible for the limited purposes of showing background and intent or knowledge. We find no error in this ruling with regard to Rule 403. Moreover, the evidence of prior narcotics transactions

"did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged." *Roldan–Zapata,* 916 F.2d at 804. Finally, the district judge gave proper limiting instructions to the jury regarding the evidence of prior narcotics transactions both during the trial and in his charge to the jury following summations. Thus, the district court's decision to admit such evidence despite objections of unfair prejudice, in our view, was not an abuse of discretion.

II. *Sufficiency of the Evidence*

Edwyn Pitre, Joseph Pitre, and Otero claim that the evidence presented against them was legally insufficient to support their convictions.

■ Under the well-established standards by which we review claims challenging the sufficiency of the evidence, an appellant making such a challenge bears a very heavy burden. A conviction must be allowed to stand if, "after viewing the evidence in the light most favorable to the prosecution," the reviewing court finds that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). "The jury must have a full opportunity to determine credibility, weigh the evidence, and draw justifiable inferences of fact, ... and all permissible inferences must be construed in favor of the government." *United States v. Martino,* 759 F.2d 998, 1002 (2d Cir.1985) (citation omitted).

If "substantial evidence" exists to support a verdict, it must be sustained, *United States v. Zabare,* 871 F.2d 282, 286 (2d Cir.), *cert. denied,* 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989) (quoting *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)); "the evidence need not have excluded every possible hypothesis of innocence." *United States v. Soto,* 716 F.2d 989, 993 (2d Cir. 1983). "Further, a reviewing court must view pieces of evidence not in isolation but in conjunction." *United States v.*

*Casamento,* 887 F.2d 1141, 1156 (2d Cir. 1989), *cert. denied,* 495 U.S. 958, 110 S.Ct. 2564, 109 L.Ed.2d 746 (1990).

■■■■ The above-mentioned standard of deference is especially important when reviewing a conviction of conspiracy. *United States v. Nusraty,* 867 F.2d 759, 762 (2d Cir.1989). This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case "where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Provenzano,* 615 F.2d 37, 45 (2d Cir.), *cert. denied,* 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980). The existence of and participation in a conspiracy may be established through circumstantial evidence. *Soto,* 716 F.2d at 991. However, "there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Gaviria,* 740 F.2d 174, 183 (2d Cir.1984). Finally, we note that "once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." *Casamento,* 887 F.2d at 1156.

Based on these principles, the jury reasonably could have inferred, *inter alia,* the following set of common essential facts. On July 11, 1989, Lin informed Hom, who was posing as a narcotics dealer, that he could take ten units of heroin because he had some "buyers in Brooklyn." On July 13, 1989, Richard Pitre agreed to purchase seven units of heroin from Hom. The transaction was to take place in a deserted section of Manhattan. Shortly after 9:40 p.m., on July 13, 1989, a four-car caravan, which included the appellants, proceeded from Brooklyn to Manhattan and met Lin and Hom at a pre-designated location. When asked why there were so many people, Richard Pitre explained that they were there to carry the money. Richard Pitre

then led Hom to two of the four cars and displayed two bags containing $292,820 and $330,985, respectively. Upon viewing the money, Hom notified his supervisor and the appellants were arrested. Beepers were seized from each appellant incident to their arrests.

## A. Edwyn Pitre

■■■■ The jury found Edwyn Pitre guilty of one count of heroin conspiracy. At trial, Edwyn Pitre called one witness, his wife, who testified, *inter alia,* that she was in Puerto Rico with her husband from June of 1988 until September of 1988. In addition, she stated that she had never seen Edwyn Pitre with a motorcycle. This testimony was introduced to contradict the prior act testimony of Lin. In his summation to the jury, as in his brief on appeal, Edwyn Pitre contended that the government's evidence only established his "mere presence" at the arrest scene on the night of July 13, 1989.

It is clear to us that the evidence shows more than mere presence and was sufficient to sustain Edwyn Pitre's conviction. When viewed in the light most favorable to the government, the evidence revealed that during the transaction, while standing with Peechaphand, Richard Pitre, and Rodriguez, in the vicinity of Division and Orchard Streets, Edwyn Pitre inquired about an individual in a parked car. When informed that the parked car was not a problem, Edwyn Pitre noted the need to be careful.[4] Based on this conduct, the jury reasonably could have inferred that Edwyn Pitre was acting as a look-out in the unfolding narcotics transaction. *See United States v. Torres,* 845 F.2d 1165, 1168 (2d Cir.1988) (fact that defendant watched, arguably as interested participant and look-out, was factor from which jury could conclude that defendant was active participant in drug conspiracy); *United States v. Ocampo,* 650 F.2d 421, 429 (2d Cir.1981) (defendant's nervousness and assistance in

---

4. In his appellate brief, Edwyn Pitre emphasizes that Peechaphand failed to identify him at trial. However, Peechaphand described the person he observed asking about the parked car as "a short Hispanic guy," who wore "a black leather

hat." A DEA agent, who assisted in arresting Edwyn Pitre and who identified him at trial, testified that on the night of his arrest, Edwyn Pitre wore "a small what appeared to be leather cap on his head."

helping co-defendant look out for another co-defendant's car "indicated" awareness of planned illegal activity); *United States v. Pui Kan Lam*, 483 F.2d 1202, 1208 (2d Cir.1973) (jury could interpret defendant's conduct to indicate concern with police surveillance or interference from innocent passers-by, and not conduct of innocent), *cert. denied*, 415 U.S. 984, 94 S.Ct. 1577, 39 L.Ed.2d 881, and 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881, and 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974).

In addition, when Hom was taken to the back of the Pathfinder, the jury reasonably could have inferred that Edwyn Pitre either stated or heard the statement that the money was in the other car. This coupled with the prior act evidence, from which the jury could have found that Edwyn Pitre was present for at least one prior narcotics deal with Peechaphand and Lin, was sufficient to support a jury finding that Edwyn Pitre intentionally and knowingly participated in a narcotics transaction on the night of July 13, 1989. Also, when arrested that night, a beeper was seized from Edwyn Pitre. The jury was free to infer that Edwyn Pitre carried this beeper to facilitate narcotics transactions. *See United States v. Villegas*, 928 F.2d 512, 516 (2d Cir.) ("Beepers are recognized as a standard tool of the drug trafficking trade."), *cert. denied*, — U.S. —, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991). In sum, we conclude that the evidence was sufficient to sustain the jury's verdict as to Edwyn Pitre.

**B. Joseph Pitre**

 The jury found Joseph Pitre guilty of the one count of heroin conspiracy charged against him. At trial, Joseph Pitre called two witnesses. Both testified as to Joseph Pitre's good character. In addition, one of the witnesses, Joseph Pitre's employer, testified that Joseph Pitre was required to carry a beeper twenty-four hours a day for work purposes. However, on cross-examination, this witness admitted that the beeper seized from Joseph Pitre was not the beeper provided to him for use in his work.

From the trial testimony, it was reasonable for the jury to infer that, on the night of his arrest, Joseph Pitre, who was driving a Mustang, accompanied Richard Pitre, who was in a Pathfinder, and Otero, who was driving a Samurai, to a site in Brooklyn where Peechaphand was present. There was testimony indicating that from this location the three cars followed Peechaphand, who was in a Maxima, to a pre-designated area in a deserted section of Manhattan where Lin and Hom were waiting. Hom testified that Richard Pitre led him to the parked Mustang, opened the door, reached into the back seat, unzipped a bag containing money, and stated that additionally there was another bag of money. Hom also testified that when this happened Joseph Pitre was seated in the driver's seat of the Mustang. Following his arrest, a beeper was seized from Joseph Pitre and $292,820 was recovered from the Mustang. In addition, Lin testified that Richard Pitre stated that the extra people were present to carry the money. Based on this evidence, the jury reasonably could infer that Joseph Pitre was aware that he was transporting money to be used to purchase narcotics, *cf. United States v. Sisca*, 503 F.2d 1337, 1343 (2d Cir.) ("suggestion that members of a conspiracy would entrust $60,000 in cash and a large quantity of narcotics to one who was not a full partner strains credulity"), *cert. denied*, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974), and acted intentionally and knowingly as a driver in furtherance of the charged narcotics conspiracy. *See United States v. Tussa*, 816 F.2d 58, 63 (2d Cir.1987) (evidence sufficient to sustain conviction for heroin conspiracy where, *inter alia*, defendant waited in parked car for delivery, and bag, containing heroin, was placed on back seat); *United States v. Diez*, 736 F.2d 840, 843 (2d Cir.1984) (evidence sufficient to sustain conviction for cocaine conspiracy where, *inter alia*, defendant provided transportation and was present during a narcotics transaction). In sum, we find that sufficient evidence was presented to sustain the conviction of Joseph Pitre.

## C. Angel Otero

The jury found Otero guilty of the one count of heroin conspiracy charged against him. At trial, Otero testified on his own behalf. He stated that on the night of his arrest, he and Joseph Pitre had planned to go to the movies. According to Otero, Joseph Pitre suggested they go to "the garage" to ask "the guys" to join them. Otero agreed, but wished to take a separate car so that he could visit his girlfriend after the movie. Otero testified that, after following Joseph Pitre to a garage in Brooklyn, he noticed Richard Pitre talking to "an Oriental guy."

According to Otero, Richard Pitre told Otero and Joseph Pitre that before going to the movies, Richard Pitre had to go somewhere and that they should follow him. Otero testified that en route to the movies Richard Pitre stopped on a dark street in Manhattan. Otero testified that, while he was parked and waiting, someone opened his door, pushed the seat forward, and opened a bag that was inside the car. Otero was then arrested and a beeper was seized from him. According to Otero, he had found the beeper that was seized from him in April or May of 1989. In addition to his own testimony, Otero called three character witnesses, one of whom testified as to how Otero came into possession of the beeper seized on the night of the arrest. In his summation, Otero's attorney argued that although Otero was present at the arrest scene, he was not knowingly involved in a narcotics conspiracy.

On appeal, Otero contends that the evidence was insufficient to sustain the jury's verdict. Like Joseph Pitre, Otero was present with the other defendants in Brooklyn, and drove to Manhattan as part of the four-car procession. In doing so, Otero transported a bag containing $330,985. On a deserted street in Manhattan, while Otero was seated in the Samurai, Richard Pitre opened the car door, opened a bag on the front seat, and referred to the money. In addition, when arrested, a beeper was

seized from Otero. However, unlike the evidence pertaining to Joseph Pitre's situation, there was testimony that the bag of money in the Samurai was on the *front* seat. We believe this distinction provides an even stronger basis for a jury to infer that Otero was a knowing participant in the charged conspiracy. Applying the same analysis applied to Joseph Pitre's sufficiency claim, we conclude that the verdict against Otero also was supported by sufficient evidence.

### III. *Fifth Amendment*

Both Richard Pitre and Otero allege that the government violated their fifth amendment rights at trial.[5] Because each appellant raises a different fifth amendment issue, we address each argument separately.

## A. Richard Pitre

At trial, the only defendant to testify was Otero, who accounted for his presence on the night of his arrest by explaining that he innocently followed the others at the garage in Brooklyn to the arrest scene en route to see a movie. In summation, counsel for Otero argued that the evidence against Otero showed "[s]imply that he was there" and "[s]imply that a bag was in a car he had driven." The government, in rebuttal summation, stated, *inter alia:*

> Now we come to the defendant Otero.
>
> . . . .
>
> You are also told [by Otero's attorney], forexample, that he had no guns. His function wasn't to protect the money because Angel Otero had no weapon at the time he was arrested. You will recall Detective Hom's testimony that only two percent of the narcotics transactions involved weapons, and indeed he, the detective, chose not to wear a wire that day, his choice, but because there was trust between the parties.
>
> So that we have these people there with no plausible explanation. Indeed, not only do we lack a plausible explana-

---

5. Edwyn Pitre and Joseph Pitre adopt, by reference, the fifth amendment argument raised in Richard Pitre's brief. Because our analysis is the same for each of the three appellants who present this issue, we refer only to Richard Pitre.

tion, but [Otero's counsel] in his summation cast aspersions upon the government agents.

Following the government's rebuttal summation, counsel for Richard Pitre [6] objected to the government's summation as an improper comment on the defendants' failure to testify and moved for a mistrial. Noting this objection, the district court denied the motion. Following summations, the district court instructed the jury, *inter alia*, that the burden, at all times, was upon the government to prove guilt beyond a reasonable doubt, and that no inference of any kind could be drawn from the fact that a defendant did not testify.[7]

On appeal, Richard Pitre argues that the government's statement during summation, "we have these people there with no plausible explanation," was an impermissible comment on his right to not testify, and, thus, constitutes reversible error. We disagree.

"While it is axiomatic that the Government may not comment on a defendant's failure to testify at trial," *United States v. McDermott*, 918 F.2d 319, 327 (2d Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 1681, 114 L.Ed.2d 76 (1991), "[i]n order to reverse a conviction for improper commentary on the right to remain silent, we must find that the comment was 'manifestly intended or [was] of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *United States v. Cicale*, 691 F.2d 95, 107 (2d Cir.1982) (citation omitted), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983). Viewing the government's comment during

rebuttal summation in its context, *see United States v. Damsky,* 740 F.2d 134, 141 (2d Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984), it is evident that the government was responding to Otero's version of the facts as described in his testimony and argued in his counsel's summation. We do not conclude that the government intended this remark to be a comment on the failure of any defendant to testify, nor do we conclude that the jury would "naturally and necessarily" view it as such. Further, the district court, in its charge, explicitly instructed the jury that the burden of proof was always on the government and that no inference could be drawn from a defendant's failure to testify. *See Cicale,* 691 F.2d at 107. Thus, we find Richard Pitre's claim to be without merit.

**B. Angel Otero**

▆▆▆ During the government's direct examination of DEA Agent Wayne McDonnell, the following colloquy occurred:

Q: What, if anything, else the [sic] Mr. Otero tell you that night or did you ask him and did he say to you?

A: No. Immediately thereafter, he stated that he transported a gray bag to the arrest scene. He also stated that he did not know the contents of the bag. He stated that someone had given him the bag. I then asked him who gave him the bag and he did not respond to the question.

Q: What did he do when you asked him who gave him the bag?

A: He basically looked at the floor and looked at the ceiling.

---

6. The district court recognized that all the defendants joined in this objection.

7. In its charge to the jury the district court stated in pertinent part:

In a criminal case the burden is at all times upon the government to prove guilt beyond a reasonable doubt. The law does not require that the government prove guilt beyond all possible doubt. Proof beyond a reasonable doubt is sufficient to convict. This burden never shifts to the defendant, which means that it is always the government's burden to prove each of the elements of the crimes

charged against the defendant beyond a reasonable doubt.

. . . .

Please keep in mind that the law does not compel a defendant in a criminal case to take the witness stand and testify. No presumption of guilt is raised and no inference of any kind may be drawn from the fact that a defendant did not testify. As I just stated, the defendants had no duty or burden to testify or to call any witnesses or to present any evidence. The law allows the defendants in a criminal [case] to rest upon their presumption of innocence.

Following the direct examination of Agent McDonnell, counsel for Otero moved for a mistrial based on this exchange. The district court denied this motion. Prior to his cross-examination of Agent McDonnell, counsel for Otero moved to strike certain parts of this direct testimony, or for an instruction to the jury to disregard them. This motion also was denied.

On direct examination, Otero testified that the first time he saw the bag was at the arrest scene when "they opened the door [of the Samurai] and pushed the seat forward." In Otero's summation, his counsel re-emphasized that Otero was unaware of the bag until after his arrival at the arrest scene. During the government's rebuttal summation, the following exchange occurred:

> [PROSECUTOR]: Now we come to the defendant Otero. If in point of fact Otero had an explanation on the evening as to what happened and why the bag was in the car, he could have given it to Agent McDonnell—
>
> [OTERO'S COUNSEL]: Objection.
>
> THE COURT: Objection is overruled.
>
> [PROSECUTOR]:—when he was questioned about it. You recall he said that he didn't know what was in the bag. And then Agent McDonnell testified significantly. He said Otero told him, "Somebody gave me the bag," and he declined to answer any questions after when asked who was it that gave you the bag.
>
> Is that what you are prepared to credit? His testimony this morning was not that somebody gave me the bag, I know not who; but rather somebody put it in my automobile, I didn't know it was there, and lo and behold it had $300,000 in cash.

On appeal, Otero argues that Agent McDonnell's testimony regarding the post-arrest interview and the government's remarks in rebuttal pertaining to this testimony were improper because his conduct in declining to respond to Agent McDonnell's question, regarding who gave him the bag, was an exercise of his fifth amendment right to remain silent. We find Otero's claim to be without merit.

It is undisputed that Otero was read his *Miranda* rights. *See Doyle v. Ohio,* 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976) (footnote omitted) ("[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."). Herein, despite the *Miranda* warnings, Otero made statements to Agent McDonnell during the post-arrest interview, thus, waiving his right to remain silent under *Miranda. See Moran v. Burbine,* 475 U.S. 412, 420–23, 106 S.Ct. 1135, 1140, 1141–42, 89 L.Ed.2d 410 (1986). Therefore, unless Otero resurrected and asserted his right to remain silent, the government was entitled to introduce this evidence at trial and comment on it during summation. Persuaded by the view of the First Circuit in *United States v. Goldman,* 563 F.2d 501, 502–04 (1st Cir.1977), *cert. denied,* 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978), we believe that Otero waived his right to remain silent and did not thereafter assert this right. In *Goldman,* the defendant, upon being arrested and read his *Miranda* rights, was given a standard waiver of rights form. The defendant signed this form and answered questions asked of him by the investigating agent. However, the defendant "either refused to respond or did not respond" to two of the agent's questions. During trial, the government introduced testimony concerning the defendant's conduct with regard to the two questions and commented upon it in summation. Following his conviction, the defendant appealed, claiming the testimony concerning the two questions asked by the agent and the government's remarks relating to the questions violated his right to remain silent. In analyzing his claim, the First Circuit found no indication in the record that the defendant wished to assert his right to remain silent, and the court commented that, based on the record, it appeared the defendant wished to give an

exculpatory story. Stating that the defendant's decision not to answer a question "was simply a strategic choice, perhaps based on a fear that any answer might weaken [his] story," and that "the failure to answer was not a reassertion of rights," *id.* at 504 n. 5, the First Circuit rejected the defendant's claim. Likewise, herein, since Otero clearly waived his right to remain silent and there is no indication in the record that he resurrected and asserted this right, we find his claim to be without merit.

## IV. *Sentencing Guidelines*

Both Richard Pitre and Edwyn Pitre allege that the district court erred in determining their sentences. Richard Pitre challenges the district court's four-level enhancement of his offense level, as "an organizer or leader of a criminal activity," pursuant to Sentencing Guidelines § 3B1.1(a). Edwyn Pitre disputes the district court's refusal to reduce his offense level to account for his "minimal participation" pursuant to Guidelines § 3B1.2(a).

### A. Richard Pitre

■■■ Based on his conviction for heroin conspiracy, the Probation Department assigned Richard Pitre a base offense level of 34. To account for his role in the offense, the Probation Department increased Richard Pitre's offense level by four levels pursuant to Guidelines § 3B1.1(a). Based on his criminal history category of I, Richard Pitre's sentencing range was 235 to 293 months. At his sentencing hearing, he maintained his innocence and claimed that the evidence showed that "Peechaphand was the individual who was the leader." The district judge rejected Richard Pitre's claim and sentenced him, *inter alia,* to 293 months. On appeal, he argues that the district court erred in determining his sentence. We disagree.

Section 3B1.1(a) of the Guidelines provides that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase [the defen-

dant's offense level] by 4 levels." According to § 3B1.1 Application Note 3:

In distinguishing a leadership and organizational role[,] ... [f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

The trial testimony showed that Richard Pitre conducted the negotiations regarding price, quantity, and location of the July 13, 1989 transaction; that he was the individual introduced to Hom, the purported seller, on the night of the arrests; and that he led Hom to two separate cars to display the purchase money. A district court's finding under Guidelines § 3B1.1 regarding a defendant's role in a criminal activity is a factual determination that will not be overturned unless clearly erroneous. *United States v. Garcia,* 936 F.2d 648, 656 (2d Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991). At the sentencing hearing, the district judge found that Richard Pitre was a "leader." We conclude that this finding was not clearly erroneous. *See id.* (district court finding that defendant was "organizer" under § 3B1.1(c) upheld where defendant conducted negotiations concerning price and quantity of cocaine, found source of supply, and directed activity of other participants on day of transaction).

It was not until oral argument on this appeal that counsel for Richard Pitre argued that the district court's determination of Richard Pitre's sentence was erroneous because Richard Pitre was not an organizer or leader of a criminal activity that involved five or more participants. The issue of the number of participants was not raised in the district court, nor was it specifically addressed in Richard Pitre's appellate brief. In Richard Pitre's presentence report, the Probation Department recommended a four-level increase in his offense level, pursuant to § 3B1.1(a), because "the

instant offense involved five or more participants." At Richard Pitre's sentencing hearing, Richard Pitre's attorney informed the district court that he had reviewed and discussed the presentence report with Richard Pitre, and that the only objection was to "the position of the Probation Department that [Richard Pitre was] ... a leader." Further, when questioned by the district court as to whether he agreed with the balance of the report, Richard Pitre responded in the affirmative. In light of Richard Pitre's failure to raise this issue in the district court, this court need not address the issue on appeal. *See United States v. Caba,* 955 F.2d 182, 187 (2d Cir. 1992); *United States v. Soliman,* 889 F.2d 441, 445 (2d Cir.1989). Notwithstanding this failure, we have reviewed the record evidence and we conclude that it supports the district court's sentencing determination.

## B. Edwyn Pitre

▇ Similar to Richard Pitre, the Probation Department assigned Edwyn Pitre a base offense level of 34. Based on his criminal history category of I, the Probation Department determined Edwyn Pitre's sentencing range to be 151 to 188 months.

At the sentencing hearing, Edwyn Pitre's counsel stated that the government was prepared to make a statement regarding a decrease in the offense levels of Joseph Pitre and Otero, and argued that Edwyn Pitre should receive similar treatment to account for his mitigating role in the offense. Whereupon, the government consented to a one-level reduction in Edwyn Pitre's offense level, to level 33.[8] This reduced Edwyn Pitre's sentencing range to 135 to 168 months. The district court sentenced Edwyn Pitre, *inter alia,* to 144 months' imprisonment. The government also consented to a three-level reduction in Joseph Pitre's and Otero's offense levels.

This consent was given so that Joseph Pitre and Otero could be sentenced "at effectively the ... statutory minimum sentence of 120 months," which was the sentence each received.

On appeal, Edwyn Pitre argues that the district court's ruling on his request for an offense level reduction was erroneous and claims that because his conduct was not more culpable than Joseph Pitre and Otero, his offense level should have been decreased three or four levels.

Section 3B1.2 of the Guidelines provides that "[i]f the defendant was a minimal participant in any criminal activity, decrease [the defendant's offense level] by 4 levels." It also states that a two-level reduction is appropriate where the defendant was a "minor participant," and notes that a defendant's offense level should be decreased three levels where a defendant falls in between being classified as a "minimal participant" and a "minor participant." According to the Application Notes accompanying § 3B1.2, "[i]t is intended that the downward adjustment for a minimal participant will be used infrequently," and that "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as [a] minimal participant."

In sentencing Edwyn Pitre, the district court stated that Edwyn Pitre, as contrasted with Joseph Pitre and Otero, was aware of the full extent of the transaction. This finding is supported by the trial testimony, which indicated that Edwyn Pitre acted as a look-out during the instant transaction and was present during at least one prior narcotics transaction involving Richard Pitre, Lin, and Peechaphand. Thus, we do not find the district court's determination that Edwyn Pitre was not a minimal participant to be clearly erroneous. *See United States v. Lanese,* 890 F.2d 1284, 1291 (2d

---

8. We note that Guidelines § 3B1.2 authorizes the reduction in a defendant's offense level by only two, three, or four levels to account for a defendant's mitigating role. A two-level reduction in Edwyn Pitre's offense level would have resulted in a sentencing range of 121 to 151 months; Edwyn Pitre was sentenced to 144 months. On appeal, neither Edwyn Pitre nor the government challenges the district court's one-level reduction. In addition, Edwyn Pitre, in his appellate brief, does not seek a two-level reduction. Therefore, we see no need to address this issue.

Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990).

## CONCLUSION

We have considered appellants' other arguments and find them to be without merit. The judgments of each of the appellants are affirmed.