**UNITED STATES of America, Plaintiff**

**v.**

**Joseph CORCORAN, Defendant.**

**No. CR–92–656.**

United States District Court,
E.D. New York.

June 28, 1994.

---

Judith Lieb, Asst. U.S. Atty., Brooklyn, NY, for plaintiff.

Lawrence Stern, New York City, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

On November 19, 1992, defendant Joseph Corcoran was convicted upon a trial by jury of conspiring to kidnap and kidnapping, in violation of Title 18, United States Code, sections 1201(c) and (a). Defendant thereafter moved this court for a new trial pursuant to Rule 33, Fed.R.Crim.P., premising his motion on two grounds: (1) that he was denied effective assistance of counsel both prior to and during the trial; and (2) that he was denied his right under Rule 43(a), Fed. R.Crim.P. to be present at all stages of the trial. For the reasons that follow, his motion is denied.

### FACTS

#### I. *Procedural History*

Corcoran and a co-defendant, Adolfo Pisani, were arrested on May 27, 1992, and charged with conspiracy to kidnap another person, in violation of 18 U.S.C. § 1201. Defendant thereafter was arraigned by Magistrate Judge Azrack, who appointed Chris Termini, Esq., a member of the CJA Panel of this court, to represent him.

Pursuant to a cooperation agreement with the government, on July 9, 1992, Pisani pleaded guilty to conspiring to kidnap and kidnapping. On August 20, 1992, Corcoran and a third defendant, Robert Lorenzo, were charged in a superseding indictment with conspiring to kidnap and kidnapping. Trial was scheduled for November 16, 1992; on the morning of trial, Lorenzo pleaded guilty to both charges in the superseding indictment. Corcoran proceeded to trial and, as stated above, on November 19, 1992, was found guilty on both counts.

After the jury returned the verdict, the court authorized defendant to submit post-trial motions at the time of sentencing, and scheduled sentencing for February 4, 1993. (Tr. at 362–63) On January 12, 1993, Termini submitted a letter to the court asking to be relieved as counsel for defendant. *See* Affirmation of Lawrence Mark Stern, Dated July 20, 1993 ("Stern Affirm.") Ex. 2. The court granted Termini's motion on February 18, 1993 and appointed Lawrence M. Stern, Esq., also from the CJA Panel, to represent defendant. This motion followed.

#### II. *The Evidence Adduced at Trial*

A summary of the significant evidence adduced at trial follows. The complainant, Abraham Cohen, testified that shortly after midnight on May 4, 1992, he attempted to withdraw money from a cash machine located at the Chemical Bank on Bay Parkway, Brooklyn, New York. (Tr. at 42) As he left the bank, Cohen saw a man he identified as the defendant standing outside the bank, one or two feet away from the entrance; he indicated that the lighting conditions at this point were "very good." (Tr. at 42–43; 109) Cohen then drove on to the Belt Parkway, where another car cut in front of him in the right lane, forcing him to stop. (Tr. at 45) Two men—identified as the defendant and Adolfo Pisani—approached his car, and defendant dragged him out of the car and conducted a body search. (Tr. at 45–46) The men then pushed Cohen back into his car and drove away with Pisani driving, defendant in the passenger seat and Cohen between them. (Tr. at 47) Pisani, who testified for the government pursuant to a cooperation agreement, corroborated much of Cohen's testimony, as set forth below.

The two men forced Cohen to accompany them to two banks in Brooklyn and three banks in New Jersey. (Tr. at 48–56; 120–25) At some point in Brooklyn (near the Verrazano Bridge), the defendant put a knife to Cohen's neck until Pisani told him to remove it; Cohen described the knife as dark wood in color, with a handle of four to five inches. (Tr. at 51–52; 123–24) Upon leaving the last bank in New Jersey, the two forced Cohen to direct them to his apartment in New Jersey, where they seated Cohen on the couch, covered him with a tablecloth and started "messing up" the apartment. (Tr. at 55–57; 125–28) Cohen later discovered that among

other items, his television, cordless phone, iron, bank statement and checkbooks were missing. (Tr. at 83)

The two men subsequently drove Cohen back to New York. In the car, they blindfolded him and forced him to sit with his head between his knees; according to Pisani, at one point, defendant indicated that he wanted to kill or blind Cohen so he could not identify them, but Pisani said no. (Tr. at 58; 129) Cohen testified that during the time he was in the car, he was able actually to see defendant's face at least four times, for five or ten seconds. (Tr. at 103–05)

Corcoran and Pisani ultimately brought Cohen to a basement apartment in Brooklyn—identified as defendant's—where Cohen was told to get on the floor. Defendant then kicked Cohen in the back of the head, resulting in bruising around his eyes and a laceration across his nose. (Tr. at 60; 132–33) Cohen's hands and legs were tied, and he was left lying on the floor.

At some point, Cohen managed to push the blindfold up on his forehead. (Tr. at 67–68) He testified that when defendant unzipped his pants so that he could use the bathroom, he saw that defendant's right arm was covered with a number of "[g]reen or gray" tattoos. (Tr. at 73) Cohen described the apartment as having red carpet, wood paneling, a kitchen floor that was white linoleum with blue stripes and a scalloped toilet seat. (Tr. at 75–77) In addition, Cohen testified that he overheard a third man—identified as Robert "Bobby" Lorenzo—make two phone calls to Chemical Bank, pretending he was Cohen. (Tr. at 61–62) He also overheard the defendant and Lorenzo discuss using his credit cards to purchase jewelry and sneakers (Tr. at 69); references to the names Moe, Corky and Pat (Tr. at 73); and mention of the telephone number 236–8275, which was the phone number at Pisani's apartment. (Tr. at 73–74; 150) Pisani, whose nickname is "Addy Boy," indicated that the defendant's nickname is "Corky," and that defendant uses the term "Moe" to refer to other people. (Tr. at 118) He also testified that defendant and Lorenzo used Cohen's credit cards to purchase jewelry and sneakers. (Tr. at 135–38)

After being held in the apartment for more than twenty hours, Cohen was released. (Tr. at 80; 140–42)

Agent Leonard W. Hatton of the Federal Bureau of Investigation (the "FBI") testified that he conducted a search of defendant's apartment with other agents pursuant to a search warrant. (Tr. at 187) The description of the apartment provided by Agent Hatton matched that provided by Cohen. (Tr. at 188–92) Agent Hatton also testified that the other agents and he seized a pair of white Reebok sneakers and their box located in the closet; a Black & Decker steam iron located in the kitchen on a table; a scrap of paper with the name "Addy Boy" and the telephone number 236–8275 written on it found in the closet area; letters addressed to "Moe" and signed by "Corky" found in the defendant's clothing; a knife which was black in color and approximately eight and one-half inches in length found on a dresser table in the bedroom; and cotton or nylon rope and electrical wire found in a utility closet. (Tr. at 192–98) Agent Hatton further testified that the utility closet was off the hallway leading to the defendant's apartment; that the closet contained boxes and tools; and that the door was not locked, but in fact was slightly ajar. (Tr. at 199–201; 203)

In addition, Agent Michael Biasello of the FBI testified for the government. Agent Biasello stated that Cohen's credit card was used at a variety of stores in Brooklyn within an eight-block radius of defendant's apartment. (Tr. at 239) Based on an examination of telephone records, Agent Biasello indicated that numerous telephone calls were made between defendant's apartment and Pisani's residence, and that on the morning of the kidnapping, there were four phone calls between defendant's apartment and Chemical Bank. (Tr. at 241–44) Agent Biasello further alleged that defendant made the following post-arrest statements at the FBI office in Manhattan, after he was read his *Miranda* rights: that defendant did not kidnap or threaten anyone; that he knew Pisani but had not spoken with him for a month and a half; and that he refused to identify who "Addy Boy" was. (Tr. at 244; 256) Further, approximately three hours later, at the

federal courthouse, defendant volunteered the statement "you ain't got shit. All you got is a stinking snitch." (Tr. at 245)

## DISCUSSION

### I. The Ineffective Assistance Of Counsel Claim

#### A. The Legal Standard

■ Defendant bases his ineffective assistance of counsel claim on a number of asserted errors, occurring both before and during the trial. The legal resolution of his claim is governed by *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), which requires a showing by defendant: (1) that his attorney's performance "fell below an objective standard of reasonableness, as determined by the range of competence required of attorneys in criminal cases," *Tate v. Wood*, 963 F.2d 20, 26 (2d Cir.1992); and (2) that there is a reasonable probability that but for counsel's errors, the result of the proceedings would have been different and more favorable to defendant. *Lockhart v. Fretwell*, —— U.S. ——, ——, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993); *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 370–71, 88 L.Ed.2d 203 (1985). Failure to make the showing of either deficient performance or sufficient prejudice is fatal to an ineffectiveness claim. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987).

■ Further, with respect to the first prong, defendant must overcome the presumption that, under the circumstances, the assistance of which he complains "might be considered sound trial strategy," *Strickland*, 466 U.S. at 689, 106 S.Ct. at 2065; "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986). To this end, the reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error in light of all of the circumstances. *Id.* With respect to the second prong, the Supreme Court recently has emphasized that "an analysis focussing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart*, —— U.S. at ——, 113 S.Ct. at 842.

■ Defendant here attempts to circumvent the second prong of the *Strickland* test—prejudice—by arguing that he is entitled to a new trial on the ground that Termini was "constructively absent" and that prejudice therefore may be presumed. *See* Defendant's Memorandum in Support of Motion for a New Trial ("Def.'s Mem.") at 5–6. Defendant bases his argument primarily on the letter Termini sent to the court on January 12, 1993, in which Termini sought leave to withdraw as counsel and made the following statements: (1) that "[d]espite what [he] believe[d] to be overwhelming evidence and [his] best advice, the defendant exercised his right to trial"; (2) that Termini did his best to maintain a high degree of professionalism "despite what [he] perceived was the absolute worst course of conduct"; (3) that "[i]n view of what occurred prior to and at the time of trial, the relationship between the defendant and [Termini had] become quite strained"; and (4) that he believed there were no appealable issues.[1] *See* Stern Affirm. Ex. 2. In addition, defendant maintains that counsel "effectively abandoned"

---

1. Termini explains these statements as follows: I intended to convey to the Court my professional judgment about Corcoran's best option before trial. I believed that the evidence against Corcoran was overwhelming and that, as a result, the likelihood of conviction after trial was high. Therefore, I concluded that Corcoran would benefit most by pleading guilty to the crimes charged in order to obtain a reduction in sentence for acceptance of responsibility under the Sentencing Guidelines.

When I stated that Corcoran engaged "in the absolute worst course of conduct," I meant not that his choice to exercise his right to trial was improper or "to be condemn[ed]" ..., but rather that his choice ultimately proved detrimental to his own interests by precluding a reduction of his sentence based on an admission of guilt and a showing of remorse.
Supplemental Affidavit of Chris Termini, Sworn to Dec. 17, 1993 ("Supp. Termini Aff.") ¶ 10.

him by failing to meet and speak with him frequently enough and meeting and speaking with him only in inopportune circumstances, failing to discuss possible pre-trial motions or trial strategy with him, failing to provide him with information he requested to prepare his case, and notifying him of the trial date only on the morning that trial was scheduled to commence. Affidavit of Joseph Corcoran, Sworn to May 9, 1993 ("Corcoran Aff.") ¶¶ 2–3; Supplemental Affirmation of Joseph Corcoran, Dated Nov. 9, 1993 ("Corcoran Affirm.") ¶¶ 3–7. Termini vigorously disputes these allegations regarding his performance. Affidavit of Chris Termini, Sworn to Oct. 13, 1993 ("Termini Aff.") ¶¶ 3–5; Supp. Termini Aff. ¶¶ 2–9. Finally, defendant alleges that numerous errors allegedly committed by his counsel before and during the course of the trial, described below, show that his counsel was constructively absent.

Defendant's reliance on *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) and *United States v. Cronic,* 466 U.S. 648, 658–59, 104 S.Ct. 2039, 2046–47, 80 L.Ed.2d 657 (1984), as support for this argument is misplaced. In *Cuyler,* the Court focused on whether multiple representation of conflicting interests by counsel violated the Sixth Amendment; the Court concluded that "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." 446 U.S. at 349–50, 100 S.Ct. at 1719. It is clear that counsel in this case—even if he in fact felt that his relationship with defendant was strained and that defendant should have pleaded guilty—was not laboring under such a conflict.

In *Cronic,* the Court recognized that no showing of prejudice is required in certain limited circumstances, such as where counsel is either totally absent or prevented from assisting the accused during a critical stage in the proceeding; where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing," and where a

defendant is " 'denied the right of effective cross-examination.' " 466 U.S. at 659 & n. 25, 104 S.Ct. at 2047 & n. 25 (citations omitted). The Court went on to note that "[a]part from circumstances of that magnitude ... there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at 659 & n. 26, 104 S.Ct. at 2047 & n. 26. After considering Termini's January 12 letter, Corcoran's claims concerning Termini's failure to meet with him and Termini's refutation of those claims,[2] as well as the errors asserted by defendant, discussed below, the court concludes that Termini's performance did not fall to the level envisioned by the *Cronic* Court, and defendant therefore is required to prove prejudice under *Strickland. Cf. United States v. Reiter,* 897 F.2d 639, 644–45 (2d Cir.) (refusing to presume prejudice where trial counsel failed to make motions to suppress and to effectively cross-examine witness and where counsel had pleaded guilty to a misdemeanor forgery charge before trial commenced and was late and absent various times during trial), *cert. denied,* 498 U.S. 817, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990); *United States v. Sanchez,* 790 F.2d 245, 254 (2d Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 584, 93 L.Ed.2d 587 (1986) (recognizing that requirement of showing prejudice is dispensed with only in "rare instances").

## B. The Pre–Trial Claims

Defendant first argues that trial counsel was deficient in failing to make several pre-trial motions, including a motion to suppress certain physical evidence, a motion to suppress Cohen's in-court identification and a motion to suppress post-arrest statements by defendant. In addition, defendant alleges, counsel failed to adduce evidence on his behalf. These contentions all are without merit.

**2.** In light of defendant's failure to meet the demanding standard set forth in *Cronic,* as well as the deficiency of his other arguments, as set forth herein, the court does not find it necessary to order a hearing with regard to the different versions of events adverted to by Corcoran and Termini. In addition, because the facts in the record as it now stands are sufficient to warrant denial of defendant's motion, defendant's request for subpoenas and transcripts is denied.

## 1. *Physical Evidence*

Defendant argues that he was denied effective assistance of counsel because Termini failed to move to suppress certain physical evidence seized from his apartment pursuant to a search warrant. *See* Def.'s Mem. at 6–8. According to defendant, because the terms of the warrant were so "flagrantly and generally ignored," *all* items seized should have been suppressed; at the very least, defendant argues, the knife, letters, sneakers and the rope and electrical cord seized from the utility closet should have been suppressed. To prevail on this claim, defendant not only must satisfy the two-pronged *Strickland* test, but he also must "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman,* 477 U.S. at 375, 106 S.Ct. at 2583.

With respect to the items that were seized but were not introduced at trial, including a microcassette, two of three pairs of sneakers, a survival knife, a calendar, coffee cups, glasses and certain papers and documents, because these items were not offered into evidence, even if they were seized unlawfully, they could not possibly have had any effect on the verdict. The court thus need go no further to conclude that this portion of defendant's motion is meritless.

Regarding the rope and electrical cord that were seized from the utility closet (and were admitted into evidence at trial), defendant argues that because the warrant did not specifically authorize a search of the closet, which was located on the basement level in the hallway outside of defendant's apartment, the search and seizure of these items were beyond the scope of the warrant. The government, in turn, argues that defendant did not have standing to object to the search, and that Termini therefore acted reasonably in failing to make a suppression motion.

To have standing to object to a search, an individual must establish that he had a reasonable expectation of privacy in the place searched. *See Rawlings v. Kentucky,* 448 U.S. 98, 100, 100 S.Ct. 2556, 2559, 65 L.Ed.2d 633 (1980). The inquiry into whether such a reasonable expectation of privacy exists is twofold: first, the individual must demonstrate a subjective desire to keep his effects private; and second, the individual's subjective expectation must be one that society accepts as reasonable. *United States v. Paulino,* 850 F.2d 93, 97 (2d Cir.1988) (*citing California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979)), *cert. denied,* 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989).

Here, defendant's trial counsel exercised his reasonable professional judgment in deciding not to move to suppress the items seized from the utility closet. Based on the facts that the door to the closet was unlocked and indeed was slightly ajar when the FBI agents searched defendant's residence, and that Joseph Salomone, the superintendent of the building, used the closet to store his tools, Affidavit of Michael Biasello, Sworn to Oct. 14, 1993 ("Biasello Aff.") ¶ 9, counsel reasonably could have concluded that defendant did not have a reasonable expectation of privacy in the closet and hence had no standing to bring a motion to suppress the items seized from the closet.[3] *Cf. United States v. Chen,* 629 F.Supp. 263, 270 (S.D.N.Y.1986) (finding that the defendant had a privacy interest in a locked safe inside a locked closet in the open stairwell of the house he shared with his in-laws; both the defendant and his in-laws had keys to the closet and knew the combination to the safe, and the defendant admitted the safe was his).

Defendant argues further, with regard to the physical evidence at issue, that Termini provided ineffective assistance by failing to move to suppress the black-handled knife, the Reebok sneakers and box and the

---

**3.** It also bears mentioning, as the government points out, that Termini actually took advantage of the fact that defendant shared the closet with Salomone by arguing in his summation that the government did not prove that the items seized from the closet belonged to him because others used the closet. (*See* Tr. at 297)

correspondence with references to the names "Corky" and "Moe." Because the knife was found on a dresser table in defendant's bedroom (Tr. at 194), it clearly was in "plain view;" therefore, as the Supreme Court held in *Horton v. California,* 496 U.S. 128, 142, 110 S.Ct. 2301, 2310–11, 110 L.Ed.2d 112 (1990), "[t]he search was authorized by the warrant; the seizure was authorized by the 'plain view' doctrine," and both therefore were legal. With respect to the sneakers, the warrant authorized seizure of "sneakers purchased on or after May 4, 1992, with a Credit Card." Stern Affirm. Ex. 3. While the agents did not know at the time of seizure how or when the sneakers were purchased, because the sneakers were new and were still in their box, they reasonably could have been one of the items named in the warrant. *See Dale v. Bartels,* 732 F.2d 278, 284 (2d Cir.1984) (permissible to seize items named in warrant during search conducted pursuant to warrant). And finally, with respect to the letters containing references to "Corky" and "Moe," given that seizure of certain documentary evidence was authorized by the warrant, and the relevance of the letters would be readily apparent, their seizure was not inappropriate. *See id.* (permissible to seize, *inter alia,* any evidence of a crime that is discovered in the course of a search of legitimate scope).

■ Finally, even if the agents had acted unlawfully in seizing the evidence discussed above—and they did not—the proper remedy would be suppressing and returning the items improperly seized, and not invalidating the entire search. *United States v. Matias,* 836 F.2d 744, 747 (2d Cir.1988) ("[W]hen items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search.... Courts have also indicated that the drastic remedy of the suppression of *all* evidence seized is not justified unless those executing the warrant acted 'in flagrant disregard' of the warrant's terms.")

(citations omitted). Defendant's argument that wholesale suppression is required therefore is baseless. In any event, given the overwhelming evidence against defendant, described below in section I.D, he is unable to prove a "reasonable probability" that the verdict would have been different if counsel had moved to suppress the above-described evidence, or that the trial was rendered fundamentally unfair due to counsel's alleged errors.

### 2. *In–Court Identification*

Defendant also challenges Termini's failure to move to suppress Cohen's identification of defendant. Termini originally filed a motion to suppress the photographic identification, but then withdrew it, believing it to be without merit. *See* Termini Aff. ¶ 6. This decision involved a tactical choice by Termini, which is entitled to deference and must not be subjected to the "distorting effects of hindsight." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

■ In any event, Termini's decision not to move to suppress the photographic identification certainly did not demonstrate deficient performance by him. When a witness has made a pre-trial identification, the analysis of whether he will be permitted to testify at trial involves a two-pronged inquiry: first, the court must determine whether the pretrial identification procedures were "unduly suggestive of the suspect's guilt"; second, if the procedures were unduly suggestive, the court must "weigh the suggestiveness of the pretrial process against factors suggesting that an in-court identification may be independently reliable rather than the product of the earlier suggestive procedures." [4] *United States v. Maldonado–Rivera,* 922 F.2d 934, 973 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). The Second Circuit has noted that

[i]f there is nothing inherently prejudicial about the presentation, such as use of a

***

4. The factors to be considered in evaluating the second prong of the inquiry include

"the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the

level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

*Maldonado–Rivera,* 922 F.2d at 973–74 (*quoting Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972)).

very small number of photographs or of suggestive comments, the "principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit.'" *Jarrett v. Headley,* 802 F.2d [34, 41 (2d Cir.1986)] (*quoting United States v. Archibald,* 734 F.2d 938, 940 (2d Cir.1984)). The array must not be so limited that the defendant is the only one to match the witness's description of the perpetrator.

*Maldonado–Rivera,* 922 F.2d at 974.

It is plain that in this case, the pre-trial identification procedures used were not "unduly suggestive" of defendant's guilt. Defendant's speculation that because Cohen was not presented with a picture of defendant until June 11, 1992, notwithstanding the fact that he was arrested on May 19, "[i]t may be that some form of intervening suggestion was made to Cohen," Def.'s Mem. at 10, is adequately refuted by Agent Biasello's sworn statement that he did not show Cohen pictures of defendant prior to his arrest because "[i]t was only after Corcoran was arrested on May 27, 1992 that [he] was able to obtain a current photograph of Corcoran to use in a photo array." Biasello Aff. ¶ 7. Moreover, there is no evidence that any suggestive comments were made to Cohen while he studied the photo array. *See* Biasello Aff. ¶¶ 5–6. Nor was the array itself suggestive: courts have found the use of six pictures sufficient, *see, e.g., United States v. Jakobetz,* 955 F.2d 786, 802–03 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); *United States v. Brewer,* 768 F.Supp. 104, 106 (S.D.N.Y.1991); all of the photographs depicted white men, in their thirties, with short to medium length brown hair and with light mustaches; and the court's own examination of the array readily reveals that defendant's contention that "the photo containing his face was significantly smaller than that of the other photos," Def.'s Mem. at 11, is simply not accurate. Finally, defendant's claim that the array was suggestive because the left ear of all those pictured was covered, and Cohen therefore would assume that Corcoran—who Cohen described as having an

earring in his left ear—was included in the spread, is untenable. *Cf. United States v. Kimberlin,* 805 F.2d 210, 227 (7th Cir.1986) (proper to apply tape to photos to cover up dress of individual pictured where the defendant had been described as wearing a t-shirt with a design), *cert. denied,* 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987).

Because the court concludes that the procedures used were not unduly suggestive, there is no need to consider the independent reliability of Cohen's in-court identification. Based on the foregoing discussion, counsel's failure to pursue the motion to suppress the in-court identification clearly did not deny defendant the effective assistance of counsel.

### 3. *Post–Arrest Statements*

■ Defendant also argues that trial counsel erred in failing to move to suppress his post-arrest statements. Termini alleges that he considered making a motion to suppress defendant's statements, but decided against it because it lacked merit; according to Termini, he "recall[ed] showing Corcoran copies of FBI reports of his statements ... and Corcoran stating to [him] that the reports were accurate." Termini Aff. ¶ 6.

According to defendant, upon his arrest at his state parole officer's office, he was taken to FBI headquarters, rather than to court, and "was given a form to read, but he was unable to concentrate. No oral advice of rights was given, and he refused to sign a rights waiver form.... Later in the afternoon, after he was taken to Court and counsel was assigned, he was again questioned without rights advice and outside the presence of counsel[.]" Stern Affirm. ¶ 19; *see also* Corcoran Aff. ¶ 4; Stern Affirm. Ex. 4. Agent Biasello presents a markedly different version of events: he avers that after arresting defendant, he advised him of his rights, defendant indicated that he understood his rights, and although defendant refused to sign the form, "he did not request an attorney and instead asked me and other agents, 'What's all this about.'" Biasello Aff. ¶ 2. Agent Biasello states that he thereafter explained the charges to defendant and asked him questions to which he responded. Bia-

sello Aff. ¶ 2. Agent Biasello also avers that after the agents transported Corcoran to the courthouse for his arraignment, Corcoran blurted out "You ain't got shit, all you got is a stinkin' snitch." According to Agent Biasello, "[t]his comment was not in response to any questions by [him] or other law enforcement officers." Biasello Aff. ¶ 3.

In light of the very different stories sworn to by Agent Biasello and Termini, on one hand, and defendant, on the other, the court is unable, without a hearing, to evaluate whether a motion to suppress defendant's post-arrest statements would have had merit. However, the court finds that it is unnecessary to order a hearing because even if counsel's performance was deficient in this regard, in light of the overwhelming evidence against defendant, discussed in section I.D below, there is no reasonable probability that but for counsel's errors, the result of the proceedings would have been different. Accordingly, defendant was not denied effective assistance of counsel due to Termini's failure to move to suppress defendant's post-arrest statements.

### 4. *Failure to Adduce Evidence*

Corcoran claims that he was denied effective assistance of counsel due to Termini's failure to adduce evidence on his behalf. This alleged evidence includes tapes of statements made by Pisani in prison, the testimony of Salomone that at the time of the crime, other individuals were using defendant's apartment, and evidence of defendant's alleged mental illness. Taking each claim in turn, the court concludes that all the claims are without merit.

#### a. *Pisani Tapes*

Defendant first argues that Termini should have made use of several tape-recorded statements made by Pisani in jail that were in Termini's possession. According to defendant, various statements made by Pisani on these tapes bear on Pisani's motive to testify falsely and indicate that he actually did so with respect to his cooperation agreement with the government. Def.'s Mem. at 12–13. More specifically, in a telephone conversation with his mother, Pisani stated "I'm not going through all this for 10 or 20 years.

I don't wanna be sentenced as a career criminal. If they want me to testify, he's gonna have to do something on my behalf." Def.'s Mem. at 13. Defendant alleges that Pisani also declared that he would not cooperate unless he got a sentence he wanted; that he knew he would get a sentence of less than thirty and less than ten years; that his cooperation agreement required "satisfying the agents with a conviction and telling them what they wanted to hear"; that he threatened to name someone as a co-conspirator to vindicate a grudge; and that he admitted to criminal acts which he did not disclose to the government. Def.'s Mem. at 13. Termini has averred that he listened to all the tapes and "asked Corcoran about some of the individuals mentioned on the tapes, hoping to build a defense based on the other individuals," but that Corcoran instructed him "to leave these individuals out of this matter." Termini Aff. ¶ 5; *see also* Supp. Termini Aff. ¶ 6.

As an initial matter, it bears noting that "[d]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature." *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). Termini's decision not to use the tapes in his cross-examination of Pisani hence "might be considered sound trial strategy" and is entitled to great deference. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

In any event, the court's review of the trial transcripts reveals that Termini ably cross-examined Pisani and covered the points allegedly raised on the tapes. For example, Termini asked Pisani about his prior violent felony convictions and characterized him as "a persistent felon by the time 1983 rolled around," (Tr. at 151–56); he elicited testimony that Pisani had made a false insurance claim, stolen a credit card and violated his parole, (Tr. at 156–59); he got Pisani to admit that the fact that he was facing life imprisonment with the kidnapping charges did not "sit too kindly" with Pisani, that Pisani claimed in telephone calls to his family that he "couldn't possibly take a life sentence" and that Pisani told his wife he

"couldn't do 30 to life," (Tr. at 159–62); and he tried to show that Pisani would say anything to please the government in order to receive a letter under § 5K1.1 of the United States Sentencing Guidelines. (Tr. at 164–65; 184–85) Termini used these same points in his summation, as illustrated by the following excerpt:

So is Mr. Pisani telling you everything? Ask yourselves: A convicted felon, a persistent felony offender, someone who is facing 75 years in the State Court talked his way down to 6 to 12. He managed to do a nice job.

He apparently had other convictions. He got a sweetheart of a deal. On the street less than a year and he's back at it again. Back at it again. Now this time he's really behind the eight ball. This time he's got to do something. If he doesn't do something dramatic, he's going to go away maybe for life, maybe for 30 years. He's desperate. He's got to do something.

So what does he do? He gives them the one person that he knows he can give, the one person that is a perfect fall guy for him. The one person. He doesn't give him all these other individuals. He gives them the person he can set up, the one who can't get back at him. That's what he gives him. That's what he's done in this case.

(Tr. at 292–93)

The foregoing examples make clear that Termini effectively cross-examined Pisani. Even attributing to the tapes the importance which defendant assigns them, the court concludes that Termini's use of the statements from the tapes largely would have been cumulative of the testimony he elicited from Pisani.[5] Defendant therefore has failed to show a reasonable likelihood that the outcome of the trial would have been different had Termini made greater use of the tapes, and his claim must fail.[6]

### b. *The Salomone Testimony*

■ Defendant also claims that Termini should have presented the testimony of Salomone, the superintendent of Corcoran's apartment building, to the effect that at the time of the crime, other people were using Corcoran's apartment in Corcoran's absence. According to defendant, this testimony "was relevant to show that others committed this crime and had control of the premises where it was committed[.]" Def.'s Mem. at 14. However, as the government points out, Termini's decision not to present Salomone's testimony as a witness certainly "might be considered sound trial strategy," *Strickland*, 466 U.S. at 289, 104 S.Ct. at 1802–03, in light of the fact that Salomone also informed Special Agent Walter G. Carroll that an individual named "Bobby" lived with Corcoran for two weeks in March, that he last saw Bobby during the weekend of May 9, 1992 and that Salomone remembered hearing defendant mention the name "Addy Boy." *See* Affidavit of Walter G. Carroll, Sworn to Oct. 14, 1993 and Report annexed thereto. Because this testimony would tend to corroborate that of Cohen and Pisani, Termini reasonably could have concluded that calling Salomone as a witness would have been more prejudicial than helpful.

### c. *Alleged Mental Illness*

■ In addition, defendant argues that Termini's performance was deficient because he failed to introduce evidence of defendant's history of mental illness "which was relevant to show that defendant was duped, misled, or had no knowledge of what actually was taking place [in his apartment]." Def.'s Mem. at 14. This history consists of a finding in 1972 that defendant was incompetent to stand trial after he was diagnosed as a paranoid schizophrenic, as well as defendant's history of drug abuse. Stern Affirm. ¶ 25. According to defendant, this history is relevant to his defense that "either alone, or exacerbated by

---

**5.** It also bears noting that the court instructed the jury to scrutinize Pisani's testimony with "great care" and "particular caution" and to consider whether his testimony was motivated by personal gain. (Tr. at 322–23)

**6.** The request by defendant's present counsel that he be permitted to listen to and analyze the "scores of other cassettes of Pisani's jailhouse telephone conversations," Def.'s Mem. at 14 n. 1, in the event that the court feels it needs more evidence, is denied.

at the top right corner.

the Valiums he and Pisani were taking that night, his mental disease caused stupor or hallucinations which interfered with his ability to understand clearly what was going on, to intend the criminal act, or to realize it was wrong." Stern Affirm. ¶ 25.[7]

In the first place, defendant does not allege that Termini was made aware of his alleged mental illness prior to trial; in fact, Termini maintains that he learned that Corcoran had a psychiatric history only *after* he was relieved as counsel. Termini Aff. ¶ 8; *see DeCarlo v. United States*, No. 93–3347, slip op. at 3–4 (E.D.N.Y. Sept. 21, 1993) (finding "specious" argument that counsel was ineffective due to her failure to explore diminished capacity or insanity defense where the defendant did not assert that counsel was made aware of a psychiatric history or that he was incompetent at time crimes were committed). Termini also avers, and the letters written by defendant to Termini and the testimony of the arresting agents corroborate, that there was no reason to doubt Corcoran's competency at the time of trial. Termini Aff. ¶ 9; Corcoran Aff. & Exhibits annexed thereto; *cf. Dennis v. Turner*, 729 F.Supp. 15, 17 (S.D.N.Y.1990) (statements made by petitioner at suppression hearing demonstrated that petitioner had adequate understanding of his rights and the proceedings against him). Moreover, defendant's argument that his behavior during the period when the crime was committed—including taking many valiums, taking a lamp from Cohen's apartment, staying in the car while Pisani and Cohen went to various cash machines, being "duped" by Pisani and Lorenzo concerning whether they were able to obtain proceeds from the bank and credit card transactions, and "gratuitously kicking Cohen when he was immobilized"—was "bizarre" and should have given counsel notice of his incapacity is simply specious.

Finally, defendant's argument that he "could have and would have testified to his recollection of non-involvement in the acts attributed to him by Pisani and Cohen," Def.'s Mem. at 10; *see* Corcoran Affirm. ¶ 11,

is, at bottom, a challenge to Termini's decision to have Corcoran take the stand. This was a strategic decision, made in light of Termini's knowledge of all relevant circumstances at the time, and the court declines to second-guess that decision here.

## C. *The Representation at Trial Claims*

Defendant further alleges that a number of errors Termini committed during the course of representing him at trial deprived him of effective assistance of counsel. The court will address each of these alleged errors in turn below.

### 1. *Failure to Object to Portion of Pisani's Testimony*

 Defendant argues that Termini should have objected and moved for a mistrial following the testimony set forth immediately below, which Pisani offered on direct examination in response to the government's question about how long Pisani had known Corcoran:

A lot of years. I know him when I was younger. I never stood with him, and then when I got out of prison my wife's girlfriend's friend was in jail with him and he told me Corky came home, which was his nickname, Joseph, and we ended up meeting again.

(Tr. at 117–18) Termini avers that although he does not recollect this particular testimony, "it would be [his] regular practice not to object to such testimony ... [because] an objection would merely serve to highlight the testimony." Termini Aff. ¶ 7. The court agrees that Termini's decision not to object to the testimony was a reasonable tactical decision; in addition, there is no reasonable probability that but for this testimony, the result of the proceedings would have been different.

Defendant also assigns error to Termini's failure to object to Pisani's testimony that someone named "Tommy"—allegedly a friend of Corcoran's and Lorenzo's—called Pisani "and was telling [him] to get [his] ass

---

7. "At the very least," according to defendant, "the evidence was relevant to his defense that he was being misled and that his apartment was being used by others to hold the victim without [his] knowledge." Stern Affirm. ¶ 25.

here and get this fucking victim out of the house" (Tr. at 139–40) on the ground that it was inadmissible hearsay. Regardless of whether or not the statement was hearsay, as defendant argues, the court finds that there is little likelihood that the testimony prejudiced defendant because there was substantial other testimony from Pisani and Cohen establishing the fact that Cohen was in Corcoran's apartment and that others were aware of this fact.

In addition, defendant challenges the failure of trial counsel to object to the following testimony by Pisani:

> [Corcoran] was trying to talk to me and he didn't want the victim to see. As the victim was down and I was driving, Corky was on the right passenger side. He had turned around and was doing like this (indicating) with the guy bent down.

> He was saying like he wanted to kill him so he couldn't identify us. So, with that, I said no. So he went like this (indicating) like to stab his eyes out, should I stab his eyes out so he can't identify us. I said no, we don't have to go through all of that and, with that, we proceeded to drive.

(Tr. at 129) Defendant bases his objection on two grounds: (1) that a witness may not opine as to the meaning of actions of others; and (2) that the evidence was irrelevant, prejudicial and inflammatory. Defendant is mistaken on both grounds. Rule 701, Fed. R.Evid., expressly permits lay witnesses to testify as to opinions or inferences that are rationally based on their own perceptions and that will be helpful to the jury in determining a fact in issue, and Pisani's testimony was relevant to the government's establishment of the kidnapping charges against defendant. Accordingly, counsel was not deficient in failing to object to this portion of Pisani's testimony.

### 2. *Failure to Object to Introduction of Physical Evidence*

Corcoran further assigns error to Termini's failure to object to the introduction of certain physical evidence at trial, including the black-handled knife, rope, electrical cord and the pair of Reebok sneakers. Corcoran argues that introduction of these items was improper because there was no foundation linking them to the crime charged.

Determinations of relevancy generally are entrusted to the sound discretion of the trial court and will be disturbed on appeal only when they are arbitrary or irrational; similarly, a trial court's ruling regarding the danger of unfair prejudice under Fed.R.Evid. 403 will be reversed only upon a clear showing that the district court abused its discretion. *United States v. Simmons*, 923 F.2d 934, 948 (2d Cir.), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991). Termini's failure to object to the admission of the various items of physical evidence does not indicate that his performance was deficient. Those items were clearly relevant and admissible. Specifically, the black-handled knife fairly matched the description of the knife provided by Cohen and therefore was more probative than prejudicial; both documentary evidence and testimony from the owner of the store where the sneakers allegedly were purchased (Tr. at 211–17) provided ample foundation to make the admission of the sneakers more probative than prejudicial; and the fact that the rope and the wire were found in the utility room would have gone to the weight accorded this evidence, rather than its admissibility. Further, with respect to the wire, defendant argues that opinion testimony by Agent Hatton that the wire had been knotted and "pulled taut together" (Tr. at 195–96)— which was consistent with the manner in which Cohen allegedly was tied—should not have been permitted because the Agent was not qualified to give such an opinion. In the first place, Termini in fact objected to this testimony, and his objection was overruled. (Tr. at 196) And in the second place, the decision whether to admit expert testimony under Fed.R.Evid. 702 is vested in the broad discretion of the trial court, *United States v. Ruggiero*, 928 F.2d 1289 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991), and the court, in the exercise of its discretion, found that based on his education and experience (*See* Tr. at 185–86), Agent Hatton was competent to offer his opinion. In any event, in light of the overwhelming evidence adduced against defen-

dant, there is no reasonable likelihood that the outcome of the trial would have been different had Termini objected to the admission of the evidence, or that counsel's alleged error rendered the trial fundamentally unfair or unreliable.

**3. Failure to Object to Comment On Defendant's Refusal to Answer**

■ Defendant also claims he is entitled to a new trial due to Termini's failure to object to the following testimony offered by Agent Biasello in response to a question regarding what Corcoran said to him:

He told me that he didn't kidnap or threaten anyone. He told me that he knows Adolfo Pisani. However, he hadn't spoken to Mr. Pisani in a month and a half, and I produced a slip of paper from Mr. Corcoran's wallet which contained the nickname Addy Boy and the telephone number 236–8275, *and I asked Mr. Corcoran who Addy Boy was and he refused to identify that individual.*

(Tr. at 244) (emphasis added). Corcoran alleges that such testimony warranted an objection because his refusal to answer questions about Pisani "was allowed into evidence as consciousness of guilt[.]" Def.'s Mem. at 19–20.

On this point, the court finds that the Second Circuit's decision in *United States v. Pitre,* 960 F.2d 1112 (2d Cir.1992) is dispositive. In that case, it was undisputed that the defendant was read his *Miranda* rights but nonetheless made statements to a DEA Agent during a post-arrest interview. *Id.* at 1124–25. However, after answering some questions, the defendant refused to respond to one question; the Agent testified to this effect on direct examination, and the prosecutor made use of this testimony in rebuttal summation. *Id.* On appeal, defense counsel—who had objected to this testimony during trial—argued that the testimony was an improper comment on the defendant's exercise of his Fifth Amendment right to be silent. The Second Circuit rejected this claim, finding that because the defendant waived his right to remain silent by making post-arrest statements, unless he resurrected and asserted this right, the government was

entitled to introduce the evidence of his refusal to answer a question at trial and to comment on it during summation. *Id.* at 1125 (*citing United States v. Goldman,* 563 F.2d 501, 502–04 (1st Cir.1977), *cert. denied,* 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978)).

■ Here, while defendant alleges that he did not affirmatively waive his *Miranda* rights because he refused to sign the rights waiver, the failure to sign a waiver does not preclude a finding that defendant's waiver was knowing and voluntary. *See United States v. Spencer,* 995 F.2d 10, 12 (2d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 323, 126 L.Ed.2d 269 (1993); *United States v. Silva,* 715 F.2d 43, 49 (2d Cir.1983). Moreover, defendant does not dispute that he answered questions after being taken to the FBI office and "handed a form and told to read it and sign it." Corcoran Aff. ¶ 4. There is nothing in the record to indicate that defendant intended to reassert his rights when he refused to identify who Addy Boy was. Hence Termini's decision not to object to this testimony did not fall below an objective standard of reasonableness. Moreover, even if the testimony were improperly admitted, it would not have affected the outcome of the trial or rendered the proceedings unfair.

**4. Failure to Object to Portions of Government's Summation**

■ Corcoran cites three "gross misrepresentations" by the government during summation and claims that Termini's failure to object to these misrepresentations denied him effective assistance of counsel. The Second Circuit has stated that "[w]hether a prosecutor's improper statement during summation results in a denial of due process depends upon whether the improper statement causes substantial prejudice to the defendant." *United States v. Nersesian,* 824 F.2d 1294, 1327 (2d Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987); *see also United States v. Parker,* 903 F.2d 91, 98 (2d Cir.) (requiring showing of substantial prejudice), *cert. denied,* 498 U.S. 872, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990). In determining whether the defendant has suffered substantial prejudice, the court must

consider the seriousness of the alleged misconduct; the measures adopted by the court to cure the misconduct; and the certainty of conviction absent the improper statements. *United States v. Rivera,* 22 F.3d 430, 434 (2d Cir.1994); *Parker,* 903 F.2d at 98. In this case, examination of the record reveals that the statements were not "gross" misrepresentations, and that defendant was not caused substantial prejudice.

First, defendant alleges that the prosecutor misrepresented the record by stating that "the victim had observed defendant 'hour after hour after hour'." Def.'s Mem. at 20 (*citing* Tr. at 306). In fact, the prosecutor stated "[y]ou know that Abraham Cohen had every opportunity to look at the *person who sat beside him for hour and hour after hour* ..." (Tr. at 306) (emphasis added). This statement accurately characterized Cohen's testimony that although defendant told Cohen to look away from him, he was able to see defendant's face at least four times during the two or three hours that he was a passenger in the car. (Tr. at 103–05; 109–10) In any event, Termini mitigated any possible prejudice caused by the prosecutor's remark by challenging Cohen's ability to identify defendant on cross-examination and during his summation. (Tr. at 103–05; 287–88)

Second, defendant takes issue with the prosecutor's description of the testimony regarding defendant's tattoos; the prosecutor stated that when defendant pulled Cohen's pants down so he could use the bathroom, "[Cohen] saw not one tattoo, but a series of blue tattoos, and you can see on Government Exhibits 56 through 58 the number of blue tattoos on the defendant's right arm, the right arm that he said he could see." (Tr. at 271) In fact, Cohen testified that the color of Corcoran's tattoos was green or gray, while Agent Biasello testified that the predominant color of the tattoos was blue. (Tr. at 73; 238–39) The court finds that this inconsistency does not rise to the level of a "gross

misrepresentation," and that moreover, the remark would not cause substantial prejudice to defendant because the jury had the opportunity to examine the photographs of defendant's tattoos themselves and to determine their color.

Third, defendant's allegation that the prosecutor "stated that the Judge would determine the truth of Pisani's testimony when he was sentenced," Def.'s Mem. at 20, is a misstatement of the record. The prosecutor actually stated:

> You can read the agreement.... The Government makes no promises if [Pisani] gets on the stand and he doesn't tell the truth.

> Mr. Termini said well, it's the Government who decides whether he tells the truth or not. But what Aldolfo Pisani also told you is that in that agreement the Government's sole role is whether to submit the letter allowing the Judge to give him a lesser sentence, but ultimately it is Judge Glasser who decides Adolfo Pisani's sentence.

(Tr. at 304) This statement was not an example of improper prosecutorial vouching for a witness, as occurred in some of the cases cited by the parties, *see, e.g., Parker,* 903 F.2d at 100–01; *United States v. DiLoreto,* 888 F.2d 996, 998–1000 (3d Cir.1989), but in fact was an accurate statement of the law.

Finally, in addition to the lack of prejudice as discussed above, the court notes that it instructed the jury that counsels' comments were not evidence (Tr. at 9–10; 265), and that given the overwhelming evidence against defendant, discussed below in section I.D, conviction was certain notwithstanding the prosecutor's statements.

### 5. *Failure to Object to Court's Charge*

■ Defendant claims that he was denied effective assistance of counsel because Termini failed to object to the court's charge relating to specific investigation techniques.[8]

---

**8.** The content of this charge was as follows:

> You have heard reference by counsel to the fact that the Government did not use certain investigative techniques. You have heard, for example, reference by counsel to the fact that

the Government didn't take handwriting exemplars.

> You may consider that fact in determining whether the Government met its burden of proof, but I charge you, however, that there is

According to defendant, "[w]ith effective counsel on behalf of defendant, the Court would have been alerted to the inadvertent implication that there was additional evidence not introduced at trial." Def.'s Mem. at 22.

This portion of the court's charge was designed to address defendant's points in summation that the government failed to obtain handwriting exemplars and to send the exemplars to an expert witness, and also failed to obtain prints from the utility room. (*See* Tr. at 296–97) In this context, it was well within the court's discretion to give the challenged charge. *See* Sand, *Modern Federal Jury Instructions,* § 4.01 at 23–24; *United States v. Mason,* 954 F.2d 219, 222 (4th Cir.) (upholding giving of similar charge), *cert. denied,* —— U.S. ——, 112 S.Ct. 1979, 118 L.Ed.2d 578 (1992). Hence counsel was not deficient in failing to object to the charge.

### 6. *Failure to Request a Hearing On Juror's Refusal to Deliberate*

 Corcoran further alleges that he was provided ineffective assistance because Termini failed to request a hearing concerning possible juror misconduct. During deliberations, a juror sent a note stating "I have already made my decision. However, my fellow jurors are still deliberating." (Tr. at 359) Termini argued to the court that the juror's actions, as described in the note, constituted "inappropriate behavior," and further expressed concern that the juror may have spoken with a Marshal. (Tr. at 357–58) The court subsequently instructed the jury as follows:

I want to remind you, with respect to that note, of my instructions that I gave you yesterday; and, namely, that the jurors should discuss the evidence among

no legal requirement that the Government use any or all investigative techniques to prove its case. Law enforcement techniques are not your concern.

Your concern is to determine whether or not, based upon all of the evidence in this case, the Government has proved the defendant's guilt beyond a reasonable doubt.

The law does not require any party to call as a witness all persons who may have been present at any time or in any place involved in the case.

yourselves and arrive at your decision only after you have fully discussed it and don't hesitate to change your views if you have been convinced, after discussion, that your initial view may have been wrong.

I also want to remind you of the instructions which I gave you yesterday, that you're not to discuss this case with anybody outside the jury room. Discuss it among yourselves only while you're deliberating.

I would assume that the instructions which I have given you with respect to not discussing the case, talking about it to anybody else, have been observed. If the instruction has not been observed, I would appreciate having that called to my attention.

(Tr. at 359)

The Second Circuit has stated that "[d]ecisions as to when to question jurors and the manner of that inquiry are generally left to the trial judge's broad discretion." *United States v. Ruggiero,* 928 F.2d 1289, 1301 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991) (citing cases); *see also Parker,* 903 F.2d at 101 (trial judge "has considerable discretion in determining how to respond to communications indicating that the jury is experiencing confusion."). The Circuit Court has approved of the precise course chosen by the court in this case, indicating that the court has discretion to respond to jury communications (preferably after consultation with counsel) with supplemental instructions designed to cure the jury's confusion. *Parker,* 903 F.2d at 102. Termini's decision not to press for a hearing therefore was a reasonable one, and Termini adequately protected his client's interests by expressing his concerns to the court.[9]

There's no obligation which the law imposes to call every person who may appear to have some knowledge of the matter in issue at this trial. The law doesn't require any party to produce as exhibits all matters and things mentioned during the course of the trial. (Tr. at 323–24)

9. It should perhaps be noted as regards the asserted claims of ineffective assistance that the failure to advance every argument or to make every motion regardless of merit does not in and of itself place counsel's representation beyond

### D. *Lack of Prejudice*

██ As mentioned with respect to various arguments discussed above, even if defendant had been able to meet the first *Strickland* prong—deficient performance—with respect to his allegations concerning the ineffectiveness of trial counsel, in light of the overwhelming amount of evidence adduced against defendant at trial, he is unable to satisfy the second prong of the *Strickland* analysis—prejudice.

Cohen, who testified that he had ample opportunity to observe defendant, affirmatively identified Corcoran as his kidnapper, both in the pre-trial photo array and at trial. His description of the kidnapper closely matched Corcoran, and Cohen testified that he heard references to the name "Corky," which Pisani stated was Corcoran's nickname. In addition, Cohen gave a detailed description of Corcoran's apartment, and telephone records corroborated Cohen's testimony that· a third man—Lorenzo—had called Chemical Bank from Corcoran's apartment during the early morning hours of May 5.

Pisani, who admitted he committed the kidnapping with Corcoran, offered testimony that corroborated in precise detail the testimony given by Cohen. Apart from his own testimony, Pisani was linked to the crime by telephone records showing calls between his residence and Corcoran's and the slip of paper found in Corcoran's apartment with "Addy Boy" and Pisani's telephone number written on it.

Finally, the physical evidence introduced by the government, including credit card receipts, the pair of Reebok sneakers, the black-handled knife, the rope and cord, the iron, and letters containing references to the names "Corky" and "Moe" provided further evidence of defendant's guilt.

In short, given the overwhelming evidence adduced by the government at trial, there is no reasonable probability that but for counsel's errors, the result of the proceedings would have been different, or that counsel's

the range of professional competence. *See Jameson v. Coughlin,* 22 F.3d 427, 429–30 (2d Cir.

alleged errors rendered the proceedings fundamentally unfair or unreliable. For all these reasons, defendant's motion for a new trial based on the ineffective assistance of trial counsel is without merit.

### II. *The Rule 43(a) Claim*

Finally, defendant claims that he is entitled to a new trial because counsel waived his right to be present at a side-bar conference with a prospective juror during jury selection, in violation of Rule 43, Fed.R.Crim.P. The side-bar was held to question a juror who said she already had reached a decision about the case. Stern Affirm. ¶ 27.

██ It is settled that a defendant enjoys both a constitutional right and a right under Rule 43 to be present at trial. *See United States v. Rivera,* 22 F.3d 430, 438–39 (2d Cir.1994); *Polizzi v. United States,* 926 F.2d 1311, 1318–19 (2d Cir.1991); *United States v. Reiter,* 897 F.2d 639, 642 (2d Cir.), *cert. denied,* 498 U.S. 817, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990). Rule 43 provides that a defendant "shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule." Fed.R.Crim.P. 43(a). However, the right of presence may be waived as long as the waiver is both knowing and voluntary. *Polizzi,* 926 F.2d at 1319. Such waiver may come from defendant's attorney; "[a]lthough it is certainly preferable that the waiver come from the defendant directly, there is no constitutional requirement to that effect." *Id.* at 1322; *cf. United States v. Doe,* 964 F.2d 157, 159 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 628, 121 L.Ed.2d 560 (1992) ("[A] waiver by counsel of a defendant's right to be present during the proceedings is valid when made in the presence of the defendant."). Moreover, a defendant validly may waive his right by failing to invoke his right to be present "at a conference which he knows is taking place between the judge and a juror in chambers[.]" *Unit-*

1994).

*ed States v. Gagnon,* 470 U.S. 522, 529, 105 S.Ct. 1482, 1486, 84 L.Ed.2d 486 (1985).

 This authority drives the court to conclude that counsel's waiver of defendant's right to be present at the side-bar conference was valid. It also warrants mention that there is a question concerning whether defendant's presence at the side-bar even was required; Rule 43(c)(3) states that a defendant need not be present "[a]t a conference or argument upon a question of law," and a discussion with a juror about potential bias arguably involves a question of law. *Cf. Rivera,* 22 F.3d at 438–39 (content of instructions to be given to jury is purely a legal matter); *United States v. Provenzano,* 620 F.2d 985, 997–98 (3d Cir.) (appellants were not prejudiced by their absence at conference regarding marijuana smoking by jurors where question whether dismissal of jurors was compelled was one of law and district court had discretion whether to retain or dismiss jurors), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). In any event, defendant does not claim that he suffered any prejudice as the result of his failure to be present at the side-bar; the court excluded the juror who was the subject of the side-bar, and defendant "does not claim that he would have added anything to the discussion or that he was otherwise prejudiced." *Doe,* 964 F.2d at 159. Accordingly, the court denies the portion of defendant's motion for a new trial grounded in Rule 43.

## CONCLUSION

In sum, because defendant neither was denied effective assistance of counsel at trial nor excluded from a side-bar during jury selection in violation of Rule 43, Fed.R.Crim. P., his motion for a new trial is without merit, and that motion is hereby denied.

SO ORDERED.